THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES TAYLOR, Defendant-Appellant.

Fifth District   No. 5—89—0593

Opinion filed April 11, 1991.

Daniel M. Kirwan and Rita K. Peterson, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Scott Mansfield, State's Attorney, of Belleville (Kenneth R. Boyle, Stephen E. Norris, and Raymond F. Buckley, Jr., all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WELCH delivered the opinion of the court:

Defendant, Charles Taylor, appeals from his conviction of the first-degree murder of Adams Ajayi. He was tried before a jury in the circuit court of St. Clair County. Judgment was entered August 21, 1989.

Defendant raises several issues on appeal: (1) whether defendant was denied a fair trial by the trial court's refusal of his tendered instructions on involuntary manslaughter; (2) whether defense counsel was ineffective for failing to impeach two witnesses with evidence of their motive to testify falsely, *i.e.*, their possible liability under the Liquor Control Act of 1934 (Ill. Rev. Stat. 1987, ch. 43, par. 93.9 *et seq.*); (3) whether defendant was denied a fair trial where the prosecutor argued hearsay evidence substantively and misstated the evidence during closing argument; (4) whether defendant was denied a fair trial where the court admitted a photograph of the victim which was extremely prejudicial and without probative value; and (5) whether defendant is entitled to a new sentencing hearing or a reduction in sentence where the trial court based the sentence on improper factors and failed to give adequate weight to mitigating factors. Because we reverse defendant's conviction and remand this cause on the ground that the trial court erred in refusing defendant's tendered involuntary manslaughter instructions, and because we do not believe the other alleged errors are such as are likely to recur on retrial, we will set forth the facts and discuss the law only as they pertain to the refusal of the trial court to instruct the jury on involuntary manslaughter. *Smith v. Metropolitan Sanitary District of Greater Chicago* (1978), 61 Ill. App. 3d 103, 107, 377 N.E.2d 1088, 1091, *aff'd* (1979), 77 Ill. 2d 313, 396 N.E.2d 524.

Defendant was charged by indictment with first-degree murder in that, on September 2, 1988, without lawful justification and while committing a felony (robbery), he struck and kicked Adams Ajayi on the head knowing such act created a strong probability of death or great bodily harm, thereby causing the death of Adams Ajayi. The

case was tried to a jury on March 13 and 14, 1989. The following pertinent evidence was adduced.

Officer Wilbur Jeremias of the East St. Louis police department testified that he investigated the instant offense. At approximately 9:43 on the morning of September 2, 1988, he went to Riff's Tavern in East St. Louis. Ajayi was lying in the parking lot in front of Riff's on his back, apparently unconscious. Jeremias called for an ambulance and then proceeded down the street where he arrested defendant. On cross-examination, Jeremias explained that Ajayi was lying 20 to 25 feet from the front door of Riff's, with his head facing toward the tavern. Jeremias thought Ajayi had some saliva coming out of his mouth. He did not notice any vomit.

Nathaniel Cortland testified that he is also known as Riff. He manages Riff's Tavern. On the morning of the killing, Riff came out of the back room of the tavern and saw Ajayi and defendant dancing together. They danced through four or five records. Ajayi kept bumping into the jukebox. Riff told Ajayi to stop and asked him to leave. Defendant told Riff that Ajayi was his friend and that he would see that he got home. The two walked out the door together. A short while later Riff went outside and saw Ajayi lying on the ground. He saw defendant punch Ajayi at least one time. Riff saw fluid running on the ground and assumed that Ajayi had urinated in his pants. However, Ajayi's pants were not wet. Riff called the police. He returned outside and saw defendant grab Ajayi by the collar and punch him. Defendant also kicked Ajayi in the head two or three times. Defendant then entered Ajayi's car and began taking things out of the back seat and putting them in the front seat. Riff demanded the keys to Ajayi's car, and defendant threw them on the ground. Riff picked them up and gave them to his sister, his assistant manager. He locked Ajayi's car. There were 10 to 12 people standing outside observing. Finally, someone aimed a pistol at defendant. Riff disarmed the man and defendant walked away. Riff testified that the man with the gun told defendant not to hit Ajayi anymore.

Lillie Jean Cortland testified that she is Riff's sister and works as a barmaid and assistant manager at the tavern. The night before the killing, Ajayi came into the tavern at 11:30 or midnight. He was by himself. He conversed with defendant. Defendant was following Ajayi around. At 6:30 a.m., Ajayi bought defendant a beer. Defendant had been in the tavern all night but had not bought any beer. Defendant was intoxicated. At approximately 8:30 that morning, defendant ordered a beer and told the bartender Ajayi would pay for it. Ajayi refused. Ajayi began dancing and defendant joined him. Defendant

kept trying to "go in [Ajayi's] pocket." The two were bumping the jukebox, and Riff came out of the back room and asked them to leave. They did. Lillie could see the two through the glass door. Ajayi was staggering. Defendant pushed Ajayi. He then took off his jacket and punched Ajayi. Ajayi fell to the ground. When Lillie went outside, defendant was "in [Ajayi's] pocket." Ajayi's watch was lying on the ground. Lillie picked it up, and defendant asked for it, saying he was Ajayi's friend. Ajayi was throwing up and urinating after defendant hit him. Defendant was picking Ajayi up and dragging him around and slapping him. Lillie had not seen Ajayi do anything to provoke defendant other than refuse to buy defendant a beer. While Ajayi was lying on the ground, defendant kicked his leg and side. He picked Ajayi up by the collar and slapped his face. Lillie estimated that there were 50 people in the tavern the morning of the killing. At one point, while Ajayi was lying on the ground, defendant picked him up and then dropped him. Ajayi's head hit the pavement.

Willie Smith testified that he lives across the street from Riff's Tavern. Between 9 and 10 the morning of the killing, he was sitting on his front porch. Two men walked out of the tavern. One man said to the other, "Why you do me like this man? I thought we was partners. You shouldn't have do me like this." The other man was too drunk to respond. The man speaking pushed the other, then took off his jacket and hit the other man, who fell straight backward. The man standing then "went in the guy's pocket." Smith called the police. Smith identified a photograph of Ajayi as the man who had been hit and defendant as the assailant. Smith saw defendant reach in Ajayi's pocket and take some paper out and place it in his own pocket. Smith could not see what the paper was. Smith saw defendant slapping Ajayi around trying to arouse him. Finally, defendant threw Ajayi's head down. Smith saw some fluid on the ground next to Ajayi. He assumed it was vomit. Smith saw defendant kick Ajayi in the side and slap him two or three times, trying to arouse him.

Marshall Williams testified that at approximately 8 the morning of the killing, he went to Riff's Tavern. He saw Ajayi and the defendant dancing together. He returned to his home, which is across the street from the tavern, and sat on his front porch. He saw Ajayi and defendant come out of the tavern. Defendant shoved Ajayi in the back. Ajayi tried to shove defendant back but was too drunk. Defendant removed his coat and hit Ajayi with his fist in the face. Ajayi fell straight back. He did nothing to stop or soften his fall. Ajayi had been quite intoxicated when Williams had seen him inside the tavern. He fell against the jukebox several times.

Officer Walter L. Boone with the East St. Louis police department testified that he investigated the killing. He recovered $12.10 from the defendant following his arrest. The bills were very crumpled when recovered.

Philip Burch is a physician and medical examiner who conducted the autopsy on Ajayi's body. The occipital bone at the back of Ajayi's skull had been fractured. There were two bruises on the right side of Ajayi's head. The cause of death was bleeding and swelling inside the skull as a result of the fracture. The injuries to Ajayi were consistent with a blow to the head or falling and hitting the head on a hard surface such as concrete. No bruises were found on Ajayi's side or leg. Ajayi's blood-alcohol concentration was .301. This is approaching a lethal level.

Defendant testified on his own behalf. The night before and the morning of the killing he was at Riff's Tavern. He had been there all night. He had been drinking beer. He knew Ajayi as a friend. Ajayi was highly intoxicated the night before and the morning of the killing. He stumbled and fell inside the tavern several times. When Riff asked them to leave, defendant and Ajayi left together. Ajayi asked defendant to drive him home and gave defendant his car keys. Defendant responded that he also was drunk and did not have a driver's license. Ajayi was weaving and finally fell and hit the back of his head. Defendant did not push, hit or kick Ajayi. Defendant tried to wake Ajayi up. People started coming out of the tavern. Defendant slapped Ajayi in an attempt to arouse him. Defendant took his jacket off to put under Ajayi's head, but did not want to get it soiled so he threw it down. Ajayi vomited alcohol. Defendant went in Ajayi's car and began moving items from the back to the front seat so he could put Ajayi in the car to rest. When someone drew a gun, defendant left. Defendant testified that the money the police recovered from his pocket was his. Defendant denied robbing Ajayi. Defendant testified that he was also drunk the morning of the killing, but not as drunk as Ajayi. Defendant and Ajayi had been buying each other drinks all night. Defendant denied ever dropping Ajayi's head on the pavement after he had fallen. Defendant did pick Ajayi up to try to help him, but laid him down softly.

The defendant tendered several jury instructions relating to involuntary manslaughter. The State objected on the ground that there had been no evidence introduced to support the instructions. The State pointed out that defendant testified that Ajayi's death had been an accident and that defendant had not performed any acts, reckless or otherwise, which resulted in Ajayi's death. Furthermore, the evi-

dence indicated that defendant did not act recklessly in pushing, hitting and kicking Ajayi and that defendant committed these acts in the course of a robbery. The trial court refused·the instructions, finding no evidence of a reckless act by defendant.

The jury returned a verdict of guilty of first-degree murder. On August 21, 1989, the trial court sentenced defendant to 35 years in, the Department of Corrections. Defendant appeals, arguing the trial court erred in refusing his tendered instructions relating to involuntary manslaughter.

■ A defendant is entitled to have the jury instructed on involuntary manslaughter when there is some evidence in the record which would reduce the crime to involuntary manslaughter. (*People v. Banks* (1989), 192 Ill. App. 3d 986, 996, 549 N.E.2d 766, 773.) A person commits the offense of involuntary manslaughter when he unintentionally causes the death of an individual by acts which are performed recklessly and are likely to cause death or great bodily harm to another. (*Banks*, 192 Ill. App. 3d at 996, 549 N.E.2d at 773.) Thus, as explained in *Banks*, murder and involuntary manslaughter are distinguished only in terms of the mental state required: murder requires the intent to kill or do great bodily harm or knowledge that one's acts create a strong probability of such result, while involuntary manslaughter requires only reckless conduct which results in death. (*Banks*, 192 Ill. App. 3d at 996, 549 N.E.2d at 773.) It is a long-standing principle of Illinois law that death is not ordinarily contemplated as a natural consequence of blows from bare fists. (*People v. Brackett* (1987), 117 Ill. 2d 170, 180, 510 N.E.2d 877, 882.) Thus, involuntary manslaughter can result from blows with a bare fist where the defendant does not intend to kill or do great bodily harm and is reckless in delivering the blows.

■ In the instant case, the evidence indicates that both defendant and the victim were intoxicated, the victim more so than the defendant. Defendant punched Ajayi in the face one time, causing him to fall to the ground. From the medical examiner's testimony, it appears that this fall, in which Ajayi hit his head on the concrete, rather than the blow,· caused the injuries which resulted in death. Defendant then proceeded to kick and hit Ajayi as he lay on the ground. The evidence is conflicting as to whether defendant was punching or slapping Ajayi as he lay on the ground. Defendant testified that he was hitting Ajayi in an attempt to awaken or arouse him. Defendant also tried unsuccessfully to pick Ajayi up several times. Defendant testified that he was attempting to place Ajayi in his car to rest, or to arouse Ajayi. Ajayi's head hit the concrete when defendant dropped him. However, there is

no evidence that defendant dropped Ajayi with the intent to kill or harm him.

We think this evidence is sufficient to justify instructing the jury on the offense of involuntary manslaughter. This evidence would support a finding that defendant punched Ajayi and that, due to his drunkenness, Ajayi was unable to soften or stop his fall to the ground. The jury could have found that defendant was reckless in punching a person who was so intoxicated, but that defendant did not intend to kill or harm Ajayi and did not know that his actions would have such a result. The jury could have also believed that the defendant's further actions of hitting and kicking Ajayi were performed recklessly in an attempt to arouse the unconscious man. That defendant testified that he did not punch Ajayi and that his theory of defense was that it was an accidental fall does not preclude such a finding. The jury is entitled to believe or disbelieve any or all of the testimony of the defendant or any other witness, and to resolve inconsistencies between their accounts of the incident. *People v. Dixon* (1978), 58 Ill. App. 3d 557, 560, 374 N.E.2d 900, 902.

We are aware of cases that have held that where, as here, a defendant is charged with felony murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3)), an involuntary manslaughter instruction is improper because in such a case no intent is required and the defendant need not even be the actual perpetrator of the killing. (*People v. Weathers* (1974), 18 Ill. App. 3d 338, 345-46, 309 N.E.2d 795, 801.) Thus, if the jury finds that the murder was committed in the course of a forcible felony, in this case robbery, it could not find the defendant guilty of involuntary manslaughter. (See also *People v. Ellis* (1981), 93 Ill. App. 3d 981, 984, 418 N.E.2d 88, 90.) However, unlike *Weathers* and *Ellis*, in the instant case, the defendant did not admit commission of a forcible felony. Defendant denies that he took anything from Ajayi or committed any other forcible felony against Ajayi. Thus, if the jury had found that defendant did not commit a robbery or other forcible felony, it could have found defendant guilty of involuntary manslaughter. Indeed, in the instant case, the evidence would have supported a finding of guilty of involuntary manslaughter even in the presence of a finding that defendant took property from Ajayi after Ajayi was rendered unconscious. That is, if the jury had found that defendant struck Ajayi not for the purpose of taking property, but that, as an afterthought, defendant did take property from Ajayi, the killing would not have occurred during the commission of a forcible felony, but prior to the commission of a theft. The jury could have found that defendant merely took advantage of the victim's lack of consciousness

to commit a theft. See *People v. Tiller* (1982), 94 Ill. 2d 303, 316, 447 N.E.2d 174, 181.

We think in the instant case there is sufficient evidence in the record to support the giving of instructions on the offense of involuntary manslaughter. We therefore hold that the trial court erred in refusing defendant's tendered jury instructions on the offense of involuntary manslaughter. Accordingly, we reverse defendant's conviction and sentence and remand this cause for a new trial.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is reversed and this cause is remanded for a new trial.

Reversed and remanded.

HARRISON and HOWERTON, JJ., concur.