THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JONATHAN RAMEY, Defendant-Appellant.

First District (2nd Division) No. 1—89—1580

Opinion filed July 21, 1992.

Rita A. Fry, Public Defender, of Chicago (James S. Jacobs, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Michael Latz, and Michael Falagario, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant Jonathan Ramey was convicted by a jury of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(2)) and sentenced to 12 years in the custody of the Illinois Department of Corrections.

On appeal Ramey raises four issues, the first of which charges that he was denied his sixth amendment right to a public trial, requiring reversal and a remand for a new trial. During the trial, just prior to closing arguments, the trial judge, *sua sponte*, had the microphones of the public address system turned off in the courtroom. For security reasons, there was a substantial glass barrier between the working

part of the courtroom and that part where spectators sit; thus, only through loud speakers installed in the section reserved for them could members of the public hear the proceedings. The entire record made at trial of this incident is as follows:

"THE COURT: We'll have to cut the mike off. There are other jurors out there. I don't want to taint the minds of the jury.

MS. FITZSIMMONS [defense co-counsel]: Can they sit in the back in the maximum cell?

MR. O'REILLY [defense co-counsel]: There's a violation to the constitution of the open law [sic].

THE COURT: I've discussed it, I have thought about it. It's unfortunate, but I cannot have other jurors who are going to be coming in on the next case to be tainted by hearing that evidence.

MS. FITZSIMMONS: Is there any way that they can go and come back?

THE COURT: If this is a violation, so be it. We'll cut off the mike because there are some people that have to be accommodated. Across the hall there's a trial, down the hall there's a trial.

MR. O'REILLY: We object. We feel that Mr. Ramey is being denied of a fair and open trial.

THE COURT: You have objected. Let's bring in the jury. Let's bring in the jury."

Because of the inadequacy of the record, we ordered the trial judge, the State's Attorney, and defendant's counsel to inform this court whether or not members of the public were actually cleared from the courtroom, and all three agree that at least members of defendant's family, besides the venirepersons, were excluded.

There is a presumption that all trials are to be open to the public. (*Press-Enterprise Co. v. Superior Court* (1984), 464 U.S. 501, 508, 78 L. Ed. 2d 629, 637, 104 S. Ct. 819, 823; *People v. Holveck* (1990), 141 Ill. 2d 84, 100.) While this presumption is not absolute, it need yield only to "an overriding interest that is specifically articulated." (*People v. Morgan* (1987), 152 Ill. App. 3d 97, 102, *appeal denied* (1987), 115 Ill. 2d 547, *cert. denied* (1987), 484 U.S. 866, 98 L. Ed. 2d 141, 108 S. Ct. 189.) In *United States v. Griffin* (5th Cir. 1976), 527 F.2d 434, the court found that an impermissible closure implicitly occurred where the public address system in the courtroom was defective. However, because defendant did not object to the proceedings or request a continuance of the trial until the speaker system could be corrected, the

court rejected his contention that he was denied his constitutional right to a public trial. In *People v. Venters* (1987), 124 A.D.2d 57, 511 N.Y.S.2d 283, the court held that an improper closure had occurred where the courtroom doors were locked during the charge to the jury.

Therefore, it cannot be successfully maintained that in the case at bar a closure, *qua* closure, did not occur, even though the microphones were turned off only during closing arguments. The issue, then, becomes one of whether the trial court abused its discretion (*United States ex rel. Latimore v. Sielaff* (7th Cir. 1977), 561 F.2d 691, 696, *cert. denied* (1978), 434 U.S. 1076, 55 L. Ed. 2d 782, 98 S. Ct. 1266; *People v. Seyler* (1986), 144 Ill. App. 3d 250, 252) in shutting off the auditory part of the proceedings to the public portion of the courtroom during closing arguments.

■■ In *Waller v. Georgia* (1984), 467 U.S. 39, 48, 81 L. Ed. 2d 31, 39, 104 S. Ct. 2210, 2216, the United States Supreme Court adopted the four-part test of *Press-Enterprise*, which establishes when the "presumption of openness may be overcome": "[1] an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure." (*Press-Enterprise*, 464 U.S. at 510, 78 L. Ed. 2d at 638, 104 S. Ct. at 824.) Moreover, the doctrine of harmless error does not apply here. (*Waller*, 467 U.S. at 49 n.9, 81 L. Ed. 2d at 40 n.9, 104 S. Ct. at 2217 n.9.) More recently, albeit in *dicta*, the Supreme Court was unanimous in declaring that violations of public trial rights are never subject to the harmless error analysis. *Arizona v. Fulminante* (1991), 499 U.S. 279, 294, 309, 113 L. Ed. 2d 302, 321, 331, 111 S. Ct. 1246, 1256-57, 1264-65.

■ We hold that the trial court here abused its discretion in failing to meet the elements set forth in *Press-Enterprise*, for, assuming, without deciding, that an overriding interest existed, namely, the tainting of a venire from which a jury would be picked to hear the next trial, the closure was broader than necessary to protect this interest. As the record now shows, not only the venirepersons, but also the members of defendant's family were excluded from the courtroom and were thus prevented from hearing closing arguments. Accordingly, we conclude that on the facts of this case, the "presumption of openness" as set forth in *Press-Enterprise* was not overcome, and defendant was improperly denied his constitutional right to a public trial.

We also hold the proper remedy in this instance to be the granting of a new trial. As we have previously noted, *Waller* declares that "the defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee." (*Waller,* 467 U.S. at 49, 81 L. Ed. 2d at 40, 104 S. Ct. at 2217.) The remedy under *Waller* is required to be one which is "appropriate to the violation." (*Waller,* 467 U.S. at 50, 81 L. Ed. 2d at 41, 104 S. Ct. at 2217.) We find that even though the instant violation came during closing arguments, it is impossible to separate that part from the rest of the trial—the sixth amendment protects all of its component parts, and not simply the right to publicly present evidence and witnesses. (See *Waller,* 467 U.S. 39, 81 L. Ed. 2d 31, 104 S. Ct. 2210 (which involved a suppression hearing); *Press-Enterprise,* 464 U.S. 501, 78 L. Ed. 2d 629, 104 S. Ct. 819 (closure during *voir dire*).) If the sixth amendment is to have any vitality, we cannot selectively decree which portions of a trial are insignificant and are therefore eligible for closure. Thus, the remedy in this case is perforce a new trial.

Inasmuch as Ramey's three remaining issues may reemerge in the retrial of this case, we shall treat with them as well.

In the first of these issues, Ramey maintains that he was denied his right to present a defense. He makes a two-pronged argument, in the first of which he contends that he was prejudiced when the trial court changed its initial ruling that it would allow the medical examiner's testimony regarding D.S.'s (the victim's) drug abuse. Although a judge's alleged change of mind is not bound to reoccur in a new trial, a discussion of the first part of this issue is necessary to an understanding of the second part of the argument Ramey makes.

Prior to trial, the State filed a motion *in limine* to preclude Ramey from introducing evidence regarding the victim's cause of death. On December 11, 1988, some five months after she was alleged to have been assaulted, the victim died of causes unrelated to the offense with which Ramey was charged. At the hearing on the motion, Ramey claimed that if the medical examiner, Dr. Kalelkar, were called to testify, she would state that (1) as a result of her physical examination of the body, there was evidence that indicated long-standing alcohol and drug abuse. Specifically, the evidence consisted of enlarged lymph glands which would have supported a finding that the victim was a drug abuser. The doctor would also testify, according to Ramey, that (2) the medical examiner's investigator interviewed members of the victim's family who said that the victim had been a "junkie" for several years, and (3) in Dr. Kalelkar's opinion, the victim died as a result of alcohol, cocaine and opiate intoxication.

In ruling on the motion the court made the following holdings:

"THE COURT: I would allow the testimony regarding the [doctor's] medical finding which supports that [the victim] was in fact a drug abuser during a several year period.

\* \* \*

I am not going to allow [the doctor] to say my investigator talked to such and such and he said that she said that she was a drug abuser. That's not necessary for the doctor's opinion to come in.

\* \* \*

I will allow as I have indicated the limited indication by the doctor that she did in fact perform a postmortem examination of the victim. I will not allow testimony as to the cause of death of the victim. But during the course of that postmortem examination, her findings along with her collection of data indicated that the victim was a long time drug abuser."

Accordingly, in opening statements and throughout its examination of various witnesses, the defense brought out that the victim was a drug addict. However, at an offer of proof held before the doctor began to testify, it became clear that she could not testify to a reasonable degree of medical certainty that the victim was a drug addict because the autopsy alone did not reveal that the victim was a chronic cocaine or opiate abuser. Rather, the doctor could draw her conclusion that the victim was dependent on drugs only by relying upon her investigator's reports, which noted that the victim was a habitual cocaine abuser, but as indicated above, these reports previously had been ruled inadmissible. Because the court felt that any testimony the doctor could give with regard to the narcotics would be "conjecture," it held that she could testify only to the victim's alcohol abuse, since her medical findings supported this conclusion.

Ramey argues that the right of a criminal accused to present a defense is a central tenet of due process (*Washington v. Texas* (1967), 388 U.S. 14, 18, 18 L. Ed. 2d 1019, 1022-23, 87 S. Ct. 1920, 1923; *People v. Manion* (1977), 67 Ill. 2d 564, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513) and that included in this right is that of presenting relevant evidence which supports the defense's theory. (*People v. Durr* (1978), 58 Ill. App. 3d 525, 532.) The defense's theory of the case was that:

"[D.S.] freely went to Mr. Ramey's apartment and that she and Mr. Ramey had consensual intercourse. After intercourse, Ms. [S.] started acting irrationally and began throwing things. After Mr. Ramey attempted to calm her down and restrained her,

he went to sleep. The next day, the victim jumped out a second story window not because she was trying to escape but because she was mentally imbalanced as a result of prolonged drug use and her drug addiction. The doctor's testimony would have helped to establish this and bolster defendant's theory of the case."

■ Ramey errs when he argues that the trial court's mid-stream shift in position prejudiced him, for we find that the court did no such thing. The judge's ruling on the motion *in limine* was based on Ramey's claim that the doctor, according to her medical findings, could testify to a reasonable degree of medical certainty that the victim was a drug abuser. At the subsequent offer of proof, however, it was discovered that the only basis upon which the doctor could make this determination was to rely on the investigator's reports which previously had been ruled inadmissible. Consistent with its initial ruling, the trial court limited the scope of the doctor's testimony to those conclusions reasonably based on her medical findings—namely, evidence of the victim's alcohol abuse. Although the State's brief does not challenge Ramey's claim that the trial judge changed course on this issue, we may, of course, sustain the circuit court's decision upon any ground supported by the record. (*Material Service Corp. v. Department of Revenue* (1983), 98 Ill. 2d 382.) We therefore uphold the determination of the trial court on this issue.

Since the issue involved in the second part of Ramey's argument is also likely to resurface on remand, however, we shall proceed to address its merits. Ramey urges that the trial court's reason for excluding the doctor's testimony regarding the victim's alleged drug abuse was improper because it prohibited Kalelkar from relying on information ordinarily relied upon by experts in their field. (*Wilson v. Clark* (1981), 84 Ill. 2d 186, 192-93.) Ramey's argument is without foundation, however, because there is no indication in the record that these reports contain the type of information reasonably relied upon by experts in the field; it demonstrates only that the doctor relied on her investigator's reports. Even if we were to conclude otherwise, Ramey sought to introduce not only the doctor's testimony, but also, as substantive evidence, the family's statements contained in these reports that the victim had been a drug addict, to prove that she was an addict, and to prove his theory of the case that the victim jumped out of the window because she was mentally imbalanced as a result of her drug addiction. This procedure, however, would result in the use of hearsay testimony. "Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being of-

fered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." (*People v. Carpenter* (1963), 28 Ill. 2d 116, 121.) We therefore hold that the trial court was not in error in excluding the doctor's testimony.

As to his third issue, Ramey alleges that the State's failure to tender statements made by him constituted a denial of due process. Prior to trial, the defense filed a request for the discovery of all statements made by Ramey which the State might introduce. In response, the State tendered the following statement, given by Ramey to Detective Leja and Assistant State's Attorney Needham, on July 25, 1988:

"On the evening of July 18, 1988, Ramey met a girl named [D.S.]. This was the first time they met. After talking with her for a while and having some drinks, Mr. Ramey asked the girl to his apartment at 5528 South Morgan. The two walked there arriving sometime after midnight.

Mr. Ramey's two roommates were in the apartment. Mr. Ramey took [D.S.] to his bedroom and shut the door. Ramey then asked would she have sex with him. Ramey had not been with a woman for a long time. Miss [S.] refused. Mr. Ramey very much wanted to have sex so he pushed the girl on the bed, got on top of her * * *.

Mr. Ramey forced his penis into her vagina. The girl resisted. Ramey at first said after a while it did not seem that she was fighting. When Mr. Ramey was finished, Miss [S.] stated she had to use the bathroom. He took her into the bathroom and waited in there with her.

Mr. Ramey was afraid because the girl started to act crazy and said she wanted to kill him. After she went to the bathroom, she ran into the living room. Mr. Ramey followed her and grabbed her. Then he brought her back to his bedroom. At this point all of her clothes were off. * * * She started to act crazy again. Ramey took some socks and a belt and tied the girl's hands together, then he went to sleep.

* * * [He] was asleep and woke after she had gone out of the window."

The State also tendered its felony review notes to Ramey. In those notes, the following summary of Ramey's statement appeared:

"Defendant AOR—after initially denying allegation of detective, defendant admitted to Assistant State's Attorney that he raped the victim twice, then tied her up. Upon reading statements, defendant claimed he raped her only once."

Needham, after a prolonged period of cross-examination as to exactly what Ramey had said, testified that Ramey had told him specifically that he "raped the girl." Over Ramey's objection, the court allowed Needham's testimony to stand, noting that "although the words are not the same, the word 'rape' is not used, we all know that forcing someone's penis into someone's vagina is what people formally call rape." Ramey argues that in a criminal prosecution, when a properly tendered motion for discovery is made, the State must disclose all statements made by the defendant (*People v. Weaver* (1982), 92 Ill. 2d 545, 559; Ill. Rev. Stat. 1987, ch. 38, par. 114—10; 134 Ill. 2d R. 412 (a)(ii)), and that such compliance is mandatory. (*People v. Robinson* (1989), 189 Ill. App. 3d 323, 330, *appeal denied* (1990), 129 Ill. 2d 570.) Ramey further contends that the State's introduction of the disputed statement represents the use of evidence not disclosed during discovery.

Ramey posits that the trial court committed gross error when it equated the written summary statement, "Mr. Ramey then forced his penis into her vagina,". with a direct quote allegedly made by Ramey, "I raped the girl," which, he insists, confesses much more than the statement as prepared by the State's Attorney. "Standing by itself," he argues, "the statement that 'Mr. Ramey forced his penis into her vagina' would be consistent with the fact that the victim was a virgin or that she was insufficiently lubricated. The statement of 'I raped the girl' however leaves very little to the imagination and is very damaging," he concludes. Ramey thus contends that he was prejudiced by Needham's testimony.

According to well-settled law, the State is obligated to disclose to a defendant's attorney all oral statements made by the defendant whether or not such statements have been reduced to writing. (*Robinson*, 189 Ill. App. 3d at 330; Ill. Rev. Stat. 1989, ch. 38, par. 114—10.) The object of this rule is to avoid giving the State the unwarranted trial advantage of surprise. (*People v. Szabo* (1977), 55 Ill. App. 3d 866, 871.) The prejudice resulting from "surprise, unfairness, and inadequate preparation, as well as [from the lack of] an opportunity to investigate the circumstances surrounding [an undisclosed alleged] statement" is so incalculable that it cannot be conjectured by the court. *People v. Young* (1978), 59 Ill. App. 3d 254, 257.

█ The circumstances which go to form this issue, however, do not suggest that the State was given any unwarranted trial advantage. All *potentially harmful information*—indeed, all of the material to which he was entitled—was given to Ramey, whether it be in the form of his signed statement or in the form of the felony review

notes. To be sure, the latter apprised him that he had confessed to raping the victim at least once; moreover, Needham was subjected to intensive cross-examination thereon. In view thereof, we conclude that Ramey could not have been unfairly surprised by Needham's testimony.

In his fourth and final assignment of error Ramey argues that he was not proven guilty of "aggravated" criminal sexual assault because the element used to aggravate the crime, the victim's broken ankle, was caused by the victim when she jumped out of the window. However, paramedics were called to the scene, and upon being questioned by them, D.S. stated that she had been sexually assaulted and jumped out of the window to escape from her assailant. The victim was taken to a hospital where she was treated for a broken ankle and abrasions around her wrists; she also related to the hospital staff that she had been the victim of a sexual assault. Ramey was convicted of the "aggravated" charge because he inflicted "bodily harm" on the victim during the course of the sexual assault. His contention, however, that he cannot be guilty of having caused bodily harm to the victim was not raised at trial and appears nowhere in his motion for a new trial. In order to preserve an issue for appeal, an objection must be raised at trial and in a post-trial motion. *People v. Turner* (1989), 128 Ill. 2d 540, *cert. denied* (1989), 493 U.S. 939, 107 L. Ed. 2d 326, 110 S. Ct. 337; *People v. Enoch* (1988), 122 Ill. 2d 176, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.

■ Since Ramey failed to raise this issue at trial and in his written post-trial motion, his allegation would ordinarily be waived and would not need to be considered by this court on appeal. (*People v. Sargent* (1989), 184 Ill. App. 3d 1016, 1021; Ill. Rev. Stat. 1987, ch. 38, par. 116—1(c).) However, since we have determined to remand the cause for a new trial, we have considered the issue at length and find it to be without merit. In *People v. Smith* (1974), 56 Ill. 2d 328, the defendant argued a theory similar to Ramey's: that "the deceased, unprovoked by the defendant in the commission of a burglary, jumped to her death" in an attempt to escape. (*Smith*, 56 Ill. 2d at 333.) Referring to section 2—8 of the Criminal Code (Ill. Rev. Stat. 1969, ch. 38, par. 2—8), the court noted that

" '[i]t is immaterial whether the killing in such a case is unintentional or accidental ***.' *** 'It reasonably might be anticipated that an attempted robbery would meet with resistance, during which the victim might be shot either by himself or someone else in attempting to prevent the robbery, and those attempting to perpetrate the robbery would be guilty of mur-

der.' It is unimportant that the defendant did not anticipate the precise sequence of events that followed upon his entry into the apartment of [the victim]. His unlawful acts precipitated those events, and he is responsible for the consequences." (*Smith*, 56 Ill. 2d at 334.)

Applying *Smith* to the facts in this case, it is immaterial that D.S.'s injury was unintentional on Ramey's part, for it is reasonably foreseeable that a rape victim may attempt to escape and incur harm thereby, thus making her attacker responsible therefor, since his unlawful acts precipitated the escape and the consequent injury. Also, in *People v. Parra* (1975), 35 Ill. App. 3d 240, *sentence vacated on other grounds* (1976), 63 Ill. 2d 553, the defendant was convicted of reckless homicide for "operat[ing] his car so that it passed over [the victim's] body and left her lying in the middle of [the] street." (*Parra*, 35 Ill. App. 3d at 265.) In affirming the defendant's conviction, the court concluded that "[w]here *** the immediate cause of death is the human act of another which is a direct consequence of the defendant's initial reckless conduct and it is reasonably foreseeable to the defendant," the defendant's act is regarded·as the cause of death. (*Parra*, 35 Ill. App. 3d at 264.) *Smith* and *Parra* merely reflect well-established and well-defined law that appears to be universally followed and embodied in the precept that an actor is to be held liable for the natural and foreseeable consequences of his act, whether that act be civil or criminal. That D.S. might try to escape and that during her escape, she might become injured, was incontestably the natural and foreseeable consequence of Ramey's criminal act, thus making that act an "aggravated" one.

For the above-stated reasons, the judgment of the circuit court is reversed and this cause is remanded for a new trial in accordance with the views expressed herein.

Reversed and remanded.

DiVITO and McCORMICK, JJ., concur.