THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PATRICK TAINTER, Defendant-Appellant.

First District (6th Division)   No. 1—95—3935

Opinion filed January 23, 1998.

636

BUCKLEY, P.J., dissenting.

Rita A. Fry, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Linda Woloshin, and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant Patrick Tainter was found guilty of the murder of Yvonne Johnson. The trial court found defendant eligible for an extended-term sentence and sentenced him to 75 years in the Illinois Department of Corrections. Defendant now appeals.

The record on appeal indicates the following facts. Before trial, defendant filed motions *in limine* to bar certain evidence. One motion sought to bar testimony regarding acts of violence toward Johnson committed by defendant within the six years prior to the murder. Another motion sought to bar reference to a possible weapon mentioned in hospital records. The trial court denied both motions.

At trial, William Ramirez testified that on April 14, 1994, Johnson, who was the aunt of Ramirez's "common law" wife, was staying at Ramirez's apartment. At approximately 9 p.m., Ramirez saw Johnson and defendant lying on the living room couch; defendant and Johnson had been dating for 13 years. Ramirez asked defendant or the couple to leave. Defendant and Johnson left at 1:30 a.m. Ramirez testified that Johnson returned at 1:45 a.m., bleeding from the mouth and nose. Johnson went to the bathroom, washed up, and slept on the couch.

On the morning of April 15, 1994, Ramirez saw that Johnson's face and lips were swollen. When Johnson spoke, the words did not sound "right," as though her tongue was swollen. Ramirez asked Johnson what happened. After speaking to Johnson, Ramirez sug-

gested that she go to the hospital, but she declined. Ramirez did not see Johnson eat or drink that day; he tried to feed her, but she could not chew. Johnson stayed in bed the entire day, which Ramirez testified was unusual for her.

On April 16, 1994, Johnson remained in bed. Ramirez again tried to feed Johnson, but was unsuccessful. Johnson's right cheek was getting darker; her lips continued to swell. Ramirez had a neighbor, Georgianna Starr, watch Johnson while he went to the grocery store. Starr testified that Johnson's face and jaw were swollen, with a dark bruise on the right side. Although her speech was slurred, Johnson told Starr how she was injured. Both Ramirez and Starr suggested that Johnson go to the hospital, but Johnson declined.

On April 17, 1994, Ramirez saw that Johnson's face was still black and swollen. Johnson could barely walk. The first time that Johnson went to the bathroom that day, she limped and appeared weak. The second time that Johnson went to the bathroom, Ramirez helped her due to her weakness. While she sat on the toilet, Johnson slumped forward and had passed blood. Johnson asked Ramirez to telephone for an ambulance. The paramedics arrived approximately 15 minutes later. Johnson was carried out of the bathroom by paramedics and Georgianna Starr. Johnson's eyes were rolling; she was unable to speak to anyone. Johnson was ultimately taken to Illinois Masonic Hospital.

Dr. Abraham Jacob testified that he treated Johnson when she was brought into the emergency room at approximately 11 a.m. on April 17, 1994. Dr. Jacob testified that Johnson was in a "shockey state," with multiple contusions to her right shoulder, left breast, right knee and the right side of her face. Johnson's face was swollen. Dr. Jacob noticed that Johnson was mottled "all over, blotchy, reddish, like bluish." According to Dr. Jacob, X rays revealed that Johnson had a fractured mandible and older fractures of the ribs. Johnson had a cut and scrape of the knee. Rectal bleeding was also noted.

In addition, Johnson was "markedly jaundiced," which Dr. Jacob stated was caused by liver failure. Based on information from Johnson's family, Dr. Jacob was aware that Johnson was being treated for cirrhosis of the liver. Dr. Jacob was also aware that Johnson was being treated for a possible stomach ulcer, high blood pressure and a prior infection. Dr. Jacob testified that he had received information from Johnson's family "or whomever was with her" and the paramedics that Johnson had been assaulted with a blunt object three days earlier. Dr. Jacob testified that there were "two different versions;" one involved a crowbar, one involved a two by four. Johnson

was admitted to the intensive care unit, with complete respiratory support.

In the early morning hours of April 18, 1994, Johnson was in a coma. Johnson was unable to produce urine, despite being given diuretics and intravenous fluids. Dr. Jacob testified that Johnson died between 5:30 and 6 that morning.

Dr. Joseph Cogan, an assistant forensic medical examiner with the Cook County medical examiner's office, testified that on April 19, 1994, he performed an autopsy on Johnson. Dr. Cogan testified that Johnson was approximately 5 feet, 2 inches tall, weighing 191 pounds. Dr. Cogan catalogued Johnson's injuries, including swelling and hemorrhaging of the scalp and shoulders, injuries to the back of the head, hemorrhaging on both sides of the head, discoloration of the right side of her face and her right ear, and contusions of the left breast area. There was also bruising of the chest, right breast and upper abdomen. Dr. Cogan stated that trauma to the body—various blows to the body—causes hemorrhage underneath the skin.

Dr. Cogan also testified regarding the fractured mandible. Dr. Cogan stated that it was very hard to break an adult jaw in the manner Johnson's jaw was broken. Dr. Cogan testified that it would take "a considerable amount of force."

Dr. Cogan opined that Johnson died as a consequence of multiple injuries from a beating. The fracture of Johnson's jaw produced a disruption in the barrier between the mouth and the inside of her body, allowing bacteria to spread through her head, neck and shoulders. Ultimately, Johnson's organs shut down due to the bacteria spreading through her body.

Dr. Cogan testified that the hemorrhaging in this case was consistent with "a punch, a kick, a blow with some object, a lot of different things." Dr. Cogan testified that defendant may have used a two by four to inflict some of the blows against Johnson. Dr. Cogan testified that the hospital records mentioned the possibility that a crowbar or a two by four was used in the beating and that he later learned of the possibility of a fist or foot. Dr. Cogan also testified that a two by four could cause a fracture of the kind involved in this case but that he would not list a crowbar as a likely weapon.

The parties stipulated that Chicago police detective T. O'Connor would testify that he was assigned to investigate the homicide of Johnson on April 18, 1994. During the course of investigation, he left a business card with defendant's sister. On the evening of April 18, 1994, defendant telephoned Detective O'Connor and agreed to speak with Detective O'Connor regarding the homicide. Defendant met Detective O'Connor and then agreed to accompany him to the police

station. Defendant was interviewed by Detective O'Connor and Assistant State's Attorney (ASA) Bigane. Defendant was arrested at 2 p.m. on April 19.

ASA Virginia Bigane testified that she interviewed defendant at 3 p.m. on April 19, 1994. Following *Miranda* warnings, defendant stated that he had been Johnson's boyfriend for 12 years. On April 14, 1994, defendant and Johnson had been drinking alcohol in Chase Park, then went to Ramirez's apartment. Ramirez ordered defendant out of his apartment. Defendant asked Johnson to leave with him. Ramirez continued to order defendant to leave; defendant kept asking Johnson to go with him until she agreed.

After leaving the apartment, defendant and Johnson went to an outside alley area. Johnson suggested to the defendant that they go to Rudy's house because she had a key to the house. Defendant told ASA Bigane that the fact that Johnson had another man's house key made him mad and jealous. Defendant told ASA Bigane that he punched Johnson in the face, which caused Johnson to spin around. Johnson attempted to grab onto a Dumpster to regain her balance. Defendant told ASA Bigane that he then gave Johnson a "roundhouse" kick to her back side, swinging his leg around his body to gain momentum.

Defendant told ASA Bigane that when Johnson attempted to get up, defendant again punched Johnson in the jaw. Johnson fell to the ground. Defendant then kicked Johnson in the body numerous times, particularly the back and ribs, while Johnson was on the ground, yelling for help and for defendant to stop.

Defendant told ASA Bigane that he then got Johnson's purse and threw it at Johnson, saying "Here's your damn bag." Defendant left Johnson on the ground. Defendant returned to Chase Park, where he fell asleep. ASA Bigane testified that defendant was cooperative but declined to have his statement transcribed by a court reporter or to sign a handwritten statement.

Witnesses also testified regarding prior violent acts by the defendant. In each instance, the trial court instructed the jury that the evidence was being admitted on the issue of defendant's intent, motive or absence of an innocent state of mind and should be considered only for that limited purpose. Johnson's daughter, Kelly Weise, testified that in the summer of 1989, she saw defendant "back-hand" Johnson "so hard it almost knocked her off her seat." Ramirez testified that five months before Johnson died, he saw defendant slap Johnson's face so hard that blood came out of her mouth. Ramirez testified that defendant and Johnson had been arguing about whether to go out that day. Georgianna Starr testified that two months before

Johnson died, she saw defendant push Johnson onto a couch during an argument. Starr also testified that six years earlier, she had seen defendant punch Johnson in the eye during an argument.

Following closing argument and jury instructions, the jury found defendant guilty of murder. The trial court denied defendant's posttrial motion. During sentencing, Johnson's family presented victim impact statements. The State also introduced evidence of prior felony convictions for concealment of a homicidal death, robbery and burglary. The trial court, finding that defendant's actions were brutal and savage, sentenced defendant to an extended term of 75 years in prison. Defendant now appeals.

I

■ Initially, defendant contends that he was denied a fair trial because the trial court refused to instruct the jury on the lesser offense of involuntary manslaughter. The basic difference between involuntary manslaughter and murder is the mental state accompanying the conduct causing the homicide. *People v. Foster*, 119 Ill. 2d 69, 87, 518 N.E.2d 82, 89 (1987). A person commits first-degree murder when he "kills an individual without lawful justification *** [and] either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or (2) he knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9—1(a)(1), (a)(2) (West 1996). A person commits involuntary manslaughter when he "kills an individual without lawful justification *** if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." 720 ILCS 5/9—3(a) (West 1996).

■ In a murder trial, it is error to refuse an instruction on involuntary manslaughter if there is any evidence in the record which, if believed, would reduce the crime to the lesser offense. *People v. Rodgers*, 254 Ill. App. 3d 148, 152, 626 N.E.2d 260, 263 (1993). Defendant notes that Illinois recognizes that death is not ordinarily contemplated as a natural consequence of blows from bare fists. *People v. Brackett*, 117 Ill. 2d 170, 180, 510 N.E.2d 877, 882 (1987) (and cases cited therein). Defendant also argues that the evidence that he had been drinking prior to the killing is evidence of recklessness. *People v. Bembroy*, 4 Ill. App. 3d 522, 526, 281 N.E.2d 389, 393 (1972).

Accordingly, defendant relies on cases such as *People v. Taylor*, 212 Ill. App. 3d 351, 570 N.E.2d 1180 (1991). In *Taylor*, the evidence indicated:

"[B]oth defendant and the victim were intoxicated, the victim more so than the defendant. Defendant punched [the victim] in the face one time, causing him to fall to the ground. From the medical examiner's testimony, it appear[ed] that this fall, in which [the victim] hit his head on the concrete, rather than the blow, caused the injuries which resulted in death. Defendant then proceeded to kick and hit [the victim] as he lay on the ground. The evidence [was] conflicting as to whether defendant was punching or slapping [the victim] as he lay on the ground. Defendant testified that he was hitting [the victim] in an attempt to awaken or arouse him. Defendant also tried unsuccessfully to pick [the victim] up several times. Defendant testified that he was attempting to place [the victim] in his car to rest, or to arouse [the victim]. [The victim's] head hit the concrete when defendant dropped him. However, there [was] no evidence that defendant dropped [the victim] with the intent to kill or harm him." *Taylor*, 212 Ill. App. 3d at 356-57, 570 N.E.2d at 1183.

This court concluded that this evidence was sufficient to justify instructing the jury on the offense of involuntary manslaughter. *Taylor*, 212 Ill. App. 3d at 357, 570 N.E.2d at 1183.

■ However, an involuntary manslaughter instruction should not be given if the evidence clearly demonstrates that the crime was murder and there is no evidence that would reduce the crime to involuntary manslaughter. *People v. Ward*, 101 Ill. 2d 443, 451, 463 N.E.2d 696, 699 (1984). Factors to be considered when determining whether there was evidence of recklessness that would support the giving of an involuntary manslaughter instruction include: the disparity in size between the defendant and the victim; the brutality and duration of the beating; and the severity of the victim's injuries. *Rodgers*, 254 Ill. App. 3d at 153, 626 N.E.2d at 263. An involuntary manslaughter instruction is not warranted where the nature of the killing, shown by either multiple wounds or the victim's defenselessness, reveals the inapplicability of the theory. *People v. Trotter*, 178 Ill. App. 3d 292, 298, 533 N.E.2d 89, 92 (1988).

■ In this case, there was a disparity in size between the defendant and the victim, although this is not a case where an adult has killed a child, as in the *Ward* line of cases. The record shows that at the time of the killing, defendant was 36 years old, 5 feet 9 inches tall, weighing 170 pounds. Johnson was 56 years old (though appearing younger), approximately 5 feet 2 inches tall, weighing 191 pounds.

The record also discloses both the duration and brutality of the beating and Johnson's relative defenselessness. After punching Johnson in the face with sufficient force that Johnson spun around, defendant delivered a "round-house" kick that sent Johnson to the

ground. When Johnson attempted to get up, defendant punched Johnson in the jaw. Defendant continued to punch and kick Johnson numerous times while she was on the ground, causing multiple injuries. The record contains no evidence that Johnson was able to defend herself.

The medical testimony shows that Johnson's jawbone was broken and that it takes a great deal of force to cause such a fracture. Indeed, while defendant's statement refers to kicking Johnson in the back and ribs, the medical testimony also contains evidence of multiple instances of trauma to Johnson's head and bruising of Johnson's chest and upper abdomen.

Unlike *Taylor*, there was no conflicting evidence regarding the nature of the blows struck after Johnson was on the ground. Instead, the case is more similar to *Rodgers*, in which this court held that the involuntary manslaughter instruction was not warranted where the victim died of bleeding over the surface of the brain, due to blunt force injury, after defendant repeatedly punched the victim in the face.

Furthermore, the State introduced evidence to show defendant's intent and the absence of accident. Defendant contends that the trial court committed reversible error by permitting this testimony. Evidence of prior acts of misconduct is admissible if relevant for some purpose other than to show a propensity for crime and if the probative value of the evidence outweighs its prejudicial effect. *People v. Burgess*, 176 Ill. 2d 289, 307, 680 N.E.2d 357, 365 (1997). For example, the State may seek to present evidence of prior acts of abuse committed by the defendant against the victim, to show the presence of intent and the absence of accident. *Burgess*, 176 Ill. 2d at 308, 680 N.E.2d at 366. In such cases, only general similarities between the different acts are necessary. *Burgess*, 176 Ill. 2d at 308, 680 N.E.2d at 366. A trial judge's decision allowing the introduction of evidence of this nature will be upheld unless the ruling represents an abuse of discretion. *Burgess*, 176 Ill. 2d at 307, 680 N.E.2d at 365.

The record in this case shows that the trial court considered the purposes for which the evidence was offered, as well as the probative nature and prejudicial impact of the evidence, before ruling that the evidence would be admissible. In this case, as the appeal demonstrates, the defendant's mental state was very much at issue. The prior acts of abuse by defendant were relevant to show intent and the absence of mistake. Indeed, such prior incidents could be highly probative on the question of defendant's awareness of the effects of a given amount of physical force on Johnson.

The record also shows that, during *voir dire*, the trial court asked

whether evidence of prior acts of violence committed by the defendant against the victim would affect their ability to decide the case. The trial court also instructed the jury each time such testimony was elicited that the evidence was being admitted on the issue of defendant's intent, motive or absence of an innocent state of mind and should be considered only for that limited purpose.

Given this record, we cannot conclude that the trial court abused its discretion in admitting the testimony regarding defendant's prior abuse of Johnson.[1] This evidence was consistent with the intent that can be inferred from the medical testimony regarding the force necessary to produce the severity of the injuries here and from defendant's own statement admitting that he continued to kick and punch Johnson numerous times after he knocked her to the ground. The record contains evidence that defendant had been drinking several hours before the beating but no evidence that he was intoxicated at the time of the beating.

In sum, the record clearly shows the crime of murder and contains no evidence that defendant did not know that his beating of Johnson created a strong probability of death or great bodily harm to Johnson. Accordingly, the trial court did not err in refusing to give the involuntary manslaughter instruction.

## II

■ Defendant next contends that the trial court committed reversible error by admitting "anonymous multiple hearsay that speculated on the existence of a weapon." Specifically, defendant objects to the testimony of Dr. Jacob and Dr. Cogan regarding information that Johnson could have been assaulted with a crowbar or a

---

[1]Defendant also complains that the trial court rejected the defense request to change the word "offenses" to "conduct" in submitting Illinois Pattern Jury Instructions No. 3.14, limiting the consideration of the collateral incidents, to the jury. See Illinois Pattern Jury Instructions, Criminal, No. 3.14 (3d ed. 1992) (hereafter IPI Criminal 3d). However, defendant does not expressly claim error, let alone reversible error. Nor did defendant cite any authority on this point in his brief. Thus, the argument is waived on appeal. Nor is there a question of plain error. The committee notes to the most recent version of IPI Criminal 3d No. 3.14 explain that the term "conduct" is to be used where defendant's actions are not technically an "offense." As the State points out in its brief, the incidents in this case are in the nature of batteries. This is not a case where conduct not generally considered an offense—e.g., adultery, membership in a street gang—is used to prove motive. Accordingly, defendant cannot show the trial court abused its discretion on this point. Cf. People v. Curtis, 262 Ill. App. 3d 876, 890-91, 635 N.E.2d 860, 871 (1994).

two by four. Hospital records have a high degree of reliability. *Wilson v. Clark*, 84 Ill. 2d 186, 194, 417 N.E.2d 1322, 1326 (1981). Expert witnesses may consider not only medical records commonly relied upon by members of their profession in forming their opinions, but they also may testify as to the contents of these records. *People v. Pasch*, 152 Ill. 2d 133, 176, 604 N.E.2d 294, 311 (1992). A medical examiner may testify, based on medical reports and from the examiner's own observations of the evidence, which weapons might have been used in a crime. See *People v. Kidd*, 175 Ill. 2d 1, 34-35, 675 N.E.2d 910, 926-27 (1996).

■ In this case, Dr. Jacob testified regarding the possibility of a weapon in response to a question asking how Dr. Jacob knew the proper course of treatment, since Johnson was unable to speak. The record shows that the testimony was elicited as part of the basis for Dr. Jacob's opinions. The transcript also shows that Dr. Cogan was accepted as an expert in the field of forensic pathology, a field Dr. Cogan described as including:

> "examining deceased individuals, determining cause of death, performing autopsies ***, testifying in [c]ourt in regard to *** autopsy findings, [and] assisting police or other people to understand the medical findings and origins of trauma and causes of death."

Thus, Dr. Cogan was qualified to render the opinion that Johnson's death was caused by multiple injuries from a beating and to explain what sorts of objects, such as a fist, a foot, a two by four or a crowbar, are consistent with the blunt trauma at issue in this case, particularly where the objects discussed are those mentioned in the hospital records.

Defendant relies on cases such as *People v. Ramey*, 237 Ill. App. 3d 1001, 606 N.E.2d 39 (1994), in which this court ruled that the medical examiner's opinion was improper because it lacked a proper foundation and the State sought to use the underlying facts and data for substantive purposes. Defendant's brief attacks the lack of foundation for the testimony at issue. However, the record shows that defendant made no objection to Dr. Jacob's testimony in his posttrial motion. Defendant has not shown that he objected on foundational grounds at trial. Thus, defendant has waived the argument.

Similarly, defendant argues that he was denied a fair trial because the State allegedly used the testimony at issue for substantive purposes. While an expert may disclose the underlying facts, data and conclusions for the limited purpose of explaining the basis for his opinion, the contents of reports relied upon by experts would clearly be inadmissible as hearsay if offered for the truth of the mat-

ter asserted. *Pasch*, 152 Ill. 2d at 176, 604 N.E.2d at 311. However, as with the foundational argument, defendant failed to raise this objection in his posttrial motion, resulting in waiver on appeal. Moreover, the record shows that, at trial, defendant objected to only one of the references cited in his brief. The defense objected to the statement that the fracturing of Johnson's jaw was "the kind of break that a kick might be able to do or maybe even something like a two by four." Such a comment, which was the only specific reference to a two by four in the State's closing arguments, is not reversible error. See *People v. Wicks*, 236 Ill. App. 3d 97, 603 N.E.2d 594 (1992). In sum, defendant has failed to show reversible error.

## III

■ Finally, defendant argues that his sentence should be vacated, contending that he is ineligible for an extended term sentence and that the sentence is excessive in any event. Defendant has waived review of his sentence by his failure to file a postsentencing motion pursuant to section 5—8—1(c) of the Unified Code of Corrections. *People v. Reed*, 177 Ill. 2d 389, 394 (1997).

Nor does there appear to be plain error in the sentencing at issue. Defendant contends that he is ineligible for an extended-term sentence. The trial court found defendant eligible for two separate reasons: (1) the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty (730 ILCS 5/5—5—3.2(b)(2) (West 1994)); and (2) the defendant had been convicted of first degree murder and convicted of a separate offense under section 5—5—3(c)(2) within the prior 10 years (see 730 ILCS 5/5—5—3.2(b)(7), 5—5—3(c)(2) (West 1994)). On December 13, 1990, defendant had been convicted and sentenced pursuant to section 5—5—3(c)(2)(F), which applies when a defendant is convicted of a Class 2 felony within 10 years of a prior Class 2 felony conviction. Both of the convictions were for burglary.

■ Regarding the prior conviction under section 5—5—3(c)(2)(F), defendant argues that "[t]he cross-reference [in section 5—5—3.2(b)(7)], which carries its own ten-year limitation, is so cumbersome and wreaking [*sic*] of double enhancement that the legislature could not rationally have intended it to qualify as an extended term provision." However, the cases defendant cites in support of this argument, *People v. Ferguson*, 132 Ill. 2d 86, 547 N.E.2d 429 (1989), and *People v. White*, 114 Ill. 2d 61, 499 N.E.2d 467 (1986), do not involve these statutory provisions. Moreover, there is only one enhancement occurring in this proceeding. Furthermore, assuming *arguendo* that this is a case of double enhancement, that result is not improper

where the legislature intended the result. *People v. Thomas*, 171 Ill. 2d 207, 224, 664 N.E.2d 76, 85 (1996).

In this situation, the statute clearly provides that a defendant's sentence pursuant to section 5—5—3(c)(2) within the prior 10 years may provide the predicate for an extended-term sentence. 730 ILCS 5/5—5—3.2(b)(7) (West 1994). It is not irrational that the legislature would provide that a defendant who had been recidivist at the level of Class 2 felonies who then commits first degree murder would be eligible for an extended-term sentence. Defendant notes that the first of his prior burglaries did not occur within 10 years of his murder conviction, but section 5—5—3.2(b)(7) does not require that both Class 2 felonies fall within 10 years of the murder conviction. Thus, defendant was eligible for an extended-term sentence.

Defendant's brief states in passing that the State's request for the extended-term sentence appeared "solely vindictive" because he was allegedly offered a 20-year sentence as part of a plea agreement. Defendant cites no authority in support of his argument. Generally, it is not improper or evidence of prosecutorial vindictiveness to offer a defendant a reduced sentence as an incentive to plead guilty as part of a plea agreement but to recommend a greater sentence when the State's offer has been refused, particularly where the sentence imposed falls within the statutory guidelines. See *People v. Walton*, 240 Ill. App. 3d 49, 60, 608 N.E.2d 59, 67 (1992).

■ Defendant further contends that the sentence imposed was excessive, even if he was eligible for an extended term. Sentencing is a matter for the discretion of the trial court; its decision is entitled to great weight and deference. *People v. La Pointe*, 88 Ill. 2d 482, 492-93, 431 N.E.2d 344, 348 (1981).

Defendant maintains there were no aggravating factors to this homicide. When a sentence is enhanced to Class X because of prior convictions, the trial court may not use the same convictions as aggravating factors. *People v. Ward*, 243 Ill. App. 3d 850, 852, 611 N.E.2d 590, 592 (1993). However, the trial court could allocate the rest of defendant's prior convictions toward aggravation. *Cook*, 279 Ill. App. 3d at 727-28, 665 N.E.2d at 305. In this case, aside from the two burglaries, the trial court could consider that defendant had prior convictions for aggravated battery, theft, concealment of a homicidal death and robbery. Moreover, even if no aggravating factors are present, defendant is not entitled to a near-minimum sentence. *People v. Harvey*, 162 Ill. App. 3d 468, 475, 515 N.E.2d 337, 342 (1987).

The record in this case indicates that the trial court carefully considered the statutory factors in aggravation and mitigation, and

even considered nonstatutory factors in mitigation. The sentence imposed falls within the lower half of the statutory range. Thus, there was no abuse of discretion in imposing the sentence in this case.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

O'BRIEN, J., concurs.

PRESIDING JUSTICE BUCKLEY, dissenting:
I must respectfully dissent. I believe that the evidence was sufficient to justify instructing the jury on the offense of involuntary manslaughter and failure to do so constitutes reversible error.

It is well established that an instruction defining a lesser offense should be given if there is evidence in the record that, if believed by the jury, would reduce the crime to a lesser-included offense. *People v. Valdez*, 230 Ill. App. 3d 975, 985 (1992). There was evidence in this case to warrant a jury instruction on involuntary manslaughter.

A person commits involuntary manslaughter when he "unintentionally kills an individual without lawful justification *** [and] his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." 720 ILCS 5/9—3 (West 1992). The crux of the offense of involuntary manslaughter is recklessness. A "reckless" mental state is a conscious disregard of "a substantial and unjustifiable risk that circumstances exist or that a result will follow." 720 ILCS 5/4—6 (West 1992). The majority, relying on three factors set forth in *People v. Rodgers*, 254 Ill. App. 3d 148, 153 (1993), concludes that there was no evidence of recklessness to support the giving of an involuntary manslaughter instruction. I respectfully disagree.

Regarding the first factor, the majority briefly notes that there was a disparity in size between Johnson and defendant. However, consideration of this factor does not defeat an instruction for involuntary manslaughter in this case. In *People v. Drumheller*, 15 Ill. App. 3d 418 (1973), the case cited in *Rodgers*, the defendant killed a 14-month-old child by punching it in the stomach. The court held that a fatal blow from a fist may constitute murder where there is a *great* disparity in size and strength between the defendant and decedent. *Drumheller*, 15 Ill. App. 3d at 421. There is no great disparity here. As the majority points out, this is not a case where an adult has

killed a small child. See, *e.g., People v. Ward,* 101 Ill. 2d 443 (1984) (holding that involuntary manslaughter instruction was unwarranted where evidence showed that savagely brutal beating of four-year-old victim with mop handle resulted in bruises to the chest muscles, lungs, and brain and were too numerous to be counted). In fact, Johnson, who was 5 feet 2 inches and weighed 191 pounds, was 20 pounds heavier than defendant, who was 5 feet 7 inches and weighed 170 pounds. Certainly this factor provides no basis for preclusion of the involuntary manslaughter instruction.

The majority next cites the "duration and brutality of the beating" and the nature of Johnson's injuries as factors which preclude a finding of recklessness. I again respectfully disagree with the majority's conclusion. According to defendant, he struck Johnson in the face, causing her to spin around and grab onto a Dumpster to regain her balance. Defendant then kicked Johnson in her backside and then punched her in the jaw. Johnson fell to the ground and defendant kicked her in the back and ribs "numerous" times. The majority analogizes this case to *People v. Rodgers,* 254 Ill. App. 3d 148 (1993). However, the beating in *Rodgers* was quite different. In *Rodgers,* the victim was asleep on a couch when defendant approached and very forcefully punched the victim in the face approximately 7 to 13 times. The victim died almost immediately thereafter due to bleeding over the surface of the brain. *Rodgers,* 254 Ill. App. 3d at 153. In the instant case, Johnson was able to get up, walk home, wash her face and remain ambulatory for a day or two. Johnson refused medical treatment. The medical testimony presented at trial was that Johnson had bruises on her right shoulder, left breast, right knee and right side of her face. Defendant caused no broken bones other than the jaw. Defendant caused no injuries to vital organs and no lacerations. Defendant did not use a lethal weapon. Johnson died as a result of a bacterial infection due to the neglected treatment of her broken jaw, not as a direct result of the blows inflicted by defendant. Her injuries, unfortunately, did not appear life-threatening to anyone. This was not a "savagely brutal" beating certain to cause death. Rather, this was a sudden and short episode brought on by a jealous rage. The beating took place within a 15-minute interval from the time she left her home with defendant to the time she returned— alone. Additionally, the parties had been drinking several hours before which constitutes additional evidence of recklessness. See *People v. Bembroy,* 4 Ill. App. 3d 522, 526 (1972).

The evidence could support a finding that defendant did not reasonably know or intend deadly consequences. Defendant and Johnson had been dating for over 13 years. Defendant had been physical with

Johnson in the past. Enraged and jealous over Johnson's possession of another man's housekey, defendant struck her. The jury could have found that defendant was reckless in hitting Johnson, but that defendant did not intend to kill her and did not know that his actions would have such a result. The jury could reasonably have found that the fact that defendant gave Johnson her purse before he left was indicative of his lack of murderous intent since had defendant known that Johnson's death was imminent he probably would not have returned her purse. Moreover, Johnson herself did not even seek medical treatment for her injuries and refused the offer of her nephew's assistance in obtaining medical treatment.

Because even slight evidence tending to show involuntary manslaughter entitles a defendant to the jury instruction (*People v. Jenkins*, 30 Ill. App. 3d 1034 (1975)), I would reverse and remand this cause for a new trial.