THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EARLENE GIBSON, Defendant-Appellant.

Second District   No. 2—88—0862

Opinion filed April 24, 1990.

G. Joseph Weller and Barbara R. Paschen, both of State Appellate Defender's Office, of Elgin, for appellant.

Charles R. Hartman, State's Attorney, of Freeport, and John T. Moran, of La Salle Law Center, of Chicago (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Defendant, Earlene Gibson, was convicted of first-degree murder of her daughter, Joushuland (Josh), and the trial court sentenced her to 40 years' incarceration. Defendant appeals, contending the trial court erred in refusing to instruct the jury on involuntary manslaughter; that certain rebuttal testimony should not have been allowed; that she was denied the effective assistance of counsel; and that the court below did not consider proper factors in sentencing her.

The State began its case with the testimony of police and emergency personnel who described their observations as they arrived at defendant's home on February 18, 1988. Mark Marty of the Freeport police department noted that, when he arrived at the house, there was blood on the stairs leading up to the second story, in the living room, and on the handset of the telephone in the dining room. Lying next to that phone was a knife with a six-inch blade which had blood on it. The knife was subsequently received into evidence as that which killed Josh.

Officer James Teasdale related that when he arrived in the upstairs bedroom he saw the emergency personnel who were working on Josh and three family members. When he asked what had happened, he was told by defendant that Josh had fallen on a knife in the kitchen. He further noted that he had not seen any blood in the kitchen.

Defendant's son, Jelcrinis, testified that on the night of February 18, his father, James Gibson, and he had received a telephone call from defendant at their home. As Jelcrinis and his father listened on separate extensions, defendant told them that Josh had fallen on a knife, then turned to her and said, "Oh mommy, I'm stabbed."

James Gibson, defendant's ex-husband, testified that he and defendant were the parents of Josh and Jelcrinis. Upon their divorce, James received custody of both children, but in 1986, Josh had moved in with her mother. He stated that on February 18, defendant told him over the telephone that Josh had been making a sandwich in the kitchen and had been playing with the knife, and had then told defendant that she had hurt herself.

Defendant's second daughter, Sessecla Greer (Sessie), who was 10 years old, testified that in the early evening of February 18, she

was at home with her mother, her sister, and her mother's boyfriend, James Brooks. Sessie was lying on the living room floor; James was upstairs; Josh was sitting on the couch in the dining room; and defendant was sitting at the dining room table.

Sessie and her mother had an argument. Defendant went into the living room and hit Sessie on the back of the head. Josh intervened on Sessie's behalf, and then Josh and defendant began to argue and then to fight, each holding the other by her clothing. At this point, Sessie was standing halfway up the stairs, which led to the second-floor bedrooms. She said that she saw her mother let go of Josh, go into the kitchen, and return with a knife in her hand. Sessie ran upstairs to get Brooks' help. She then heard Josh say, "Bird [Brooks' nickname], she stabbed me." Sessie ran down the stairs and saw defendant standing with a knife in her hand. Josh was in the corner at the bottom of the steps, and then she ran upstairs to defendant's bedroom. Sessie followed her. There were confused efforts to phone for help, and, that having been accomplished, defendant went to Josh and covered her.

Later that night, Sessie told Assistant State's Attorney Bald that Josh had run into the knife which her mother had been holding. On the stand, Sessie denied the truth of that original story. She stated that, at the hospital, she had been instructed by her mother to say that they had been cutting ham and playing around and that Josh had slipped on the knife. However, on the night before the trial, Sessie had a conversation with the prosecutor in which she notified him that she would testify to a different version of events than those which she had related to him on February 18.

Dr. Larry Blum testified that he is the pathologist who performed the autopsy on Josh. He concluded that the wound which was the cause of death tracked from the top of the left breast down, from left to right, and from front to back. The wound was 6½ inches long, and passed through the heart, the diaphragm, and into the liver. Blum further stated that if a person had fallen on the knife with sufficient force to cause this particular wound, he would expect to see bruising around the wound from the hilt of the knife. There were no such marks on Josh's body.

Defendant's boyfriend, James Brooks (Brooks), testified on her behalf. He stated that on February 18, Josh and defendant were teasing one another and "tussling." Sessie had been involved in some trouble at school. Defendant was angry with Sessie for lying about it and hit the child on the head. Josh intervened on Sessie's behalf, and the children tussled with defendant again. Brooks broke them apart

and accompanied Sessie and Josh upstairs. Josh went to her room to watch television for 10 or 15 minutes. Brooks was in his own room, also watching television. Defendant remained downstairs.

After 10 or 15 minutes, Josh went back downstairs, saying that she had one more thing to say to her mother. The next thing he knew, Josh came back upstairs, told him, "I'm stabbed," and asked him to call an ambulance. She then fell to the floor. Defendant came in, held Josh in her arms, and said that she had not meant to hurt her baby. They put a blanket under her head, and then the ambulance arrived.

Defendant testified that Josh was 18 years old at the time of her death. On the evening in question, defendant and her daughters, Josh and Sessie, were sitting in the dining room. Defendant was teasing Josh about a letter which she had received. Defendant had snatched the letter away, and Josh was angry with her.

Defendant was angry with Sessie over an incident which had occurred at school. Sessie had moved into the living room, where defendant could not see her. She could see Josh, and Josh could see Sessie. As defendant was talking, she saw that Josh was making faces of disapproval. Then defendant leaned over and saw that Sessie was smiling at Josh. This angered her, and she slapped Sessie. Josh immediately intervened, placing herself between defendant and Sessie, and pushed defendant away. Josh then grabbed defendant's shirt and continued to shout at her to leave Sessie alone. Brooks then came along and sent the girls upstairs.

Defendant went to the kitchen to prepare sandwiches and, wondering who was eating and how they wanted their food prepared, went into the dining room. The ham was on the front porch, and she needed to get it. She was carrying the knife in her right hand as she crossed the room; her arms were folded. She could hear Josh calling her. Josh then ran into the room, bumped defendant, and knocked her off balance. Defendant uncrossed her arms, trying to regain her balance. She told Josh to stop and walked away.

Josh said, "I've been stabbed," but defendant did not believe her. Josh walked toward the staircase and collapsed against the wall. Then defendant saw that she was bleeding. Josh proceeded up the stairs.

Defendant tried to telephone for help from the dining room but had trouble getting the phone to work. She ran upstairs to the bedroom phone, but that phone would not work either. Defendant was finally able to call for help from another room. She returned to Josh, who was lying on the floor, covered her with a blanket, and cradled

her in her arms until she fainted away. The paramedics arrived, and defendant remembered that she told somebody that Josh fell on a knife. Josh was removed to the hospital, and defendant and Sessie were driven there also. Defendant denied telling Sessie what to say about the incident.

Defendant remembered that she received *Miranda* warnings at the police station, but she did not remember what she may or may not have said there. She knew that at some point, she denied having the knife in her hand when Josh was stabbed. She denied telling the police that Josh had stabbed herself.

She testified as to how she had been knocked off balance by Josh, how they pulled each other back and forth, each trying to regain balance, how she held the knife, and what she had told the police. She said that while they were tugging at each other, Josh had lost her own balance, leaned forward, then slipped and fell on the knife. Given her condition that night, defendant did not know what she told or demonstrated to anybody and did not know the "gory details" of the incident. She denied telling Josh's father that Josh had cut herself while making sandwiches.

On rebuttal, David Kentner of the Freeport police testified that he interviewed defendant the night Josh died. Defendant had told him that Josh and she had argued over Sessie. Later, they were both in the kitchen cutting ham. Josh left the room to see if the others wanted sandwiches. She returned, saying that she had cut herself. Defendant had not believed her. She sat down at the dining room table and then saw that Josh was bleeding. Josh set the knife down on the table next to defendant, walked toward the stairs, and collapsed against the wall.

Later that night, Kentner had a second conversation with defendant in which she said that she had been cutting ham alone. Josh had gone upstairs. Defendant, knife in hand, went to the living room to call Josh. Josh returned to say something to defendant, who was holding the knife next to her right leg, handle forward, blade behind. Josh saw the knife and said, "Is that for me?" and came forward. The next thing defendant remembered was sitting at the table and putting the knife down next to the phone. Josh walked to the stairs and collapsed. Defendant saw that she was bleeding and tried to call for help.

Also on rebuttal, Michael Hannan, another Freeport policeman, testified that he talked with defendant "at least 20 times" before the night of her daughter's death. The majority of those occasions had been stressful. Defense counsel's objection to the relevance of these

remarks was overruled. The prosecutor then remarked that he would "go into these other occasions, but I don't think I should go into them." The testimony was allowed. Hannan went on to say that on the night of February 18, although defendant had cried, she was lucid, coherent, and not hysterical. She had told him that Josh had been in the kitchen making sandwiches and had cut herself. Defendant did not believe that anything was wrong until she saw Josh slump against the wall. Defendant did not mention having held the knife.

Hannan told defendant that other information, as well as the physical evidence, was inconsistent with her story. He said that at this point defendant's story changed. She told him that they had both been cutting ham, Josh left, and as defendant walked toward the living room with the knife in her hand, Josh returned, saw the knife, and said, "Is that for me? I don't believe you can hurt me. I'm your daughter. I want to see you do it." Josh approached defendant, who backed away, raising her arm up. Josh pulled defendant's arm toward her chest; defendant tried to pull away. Something happened, and the knife went down. She then went to sit at the table. Defendant never told Hannan that she actually saw the knife strike her daughter.

At the instruction conference held at the close of the evidence, an involuntary manslaughter instruction tendered by defense counsel was refused pursuant to the prosecutor's objection. The jury subsequently returned a verdict of guilty.

A sentencing hearing was held on August 18, 1988. The State recommended a sentence of 25 years in the Department of Corrections. The defense argued in favor of a minimum sentence of 20 years. Defendant made her statement to the court. She was concerned because her presentence investigation report stated that she was without remorse and wanted to rebut that conclusion.

The judge, in discussing the issues in aggravation and mitigation, recalled that he had presided over defendant's divorce and had awarded custody of the children to her ex-husband because he considered her to be unstable.

The court went on to rule that one fact "very much in aggravation" was that the crime involved physical harm to the victim. Defendant's failure to acknowledge guilt was also stressed by the court. A 40-year term of incarceration was imposed. A motion to reconsider the sentence was denied.

■ Initially, defendant contends that the trial court erred in refusing to give an instruction on involuntary manslaughter. The

State argues that this issue was waived due to defendant's failure to preserve it in her motion for a new trial. (*People v. Friesland* (1985), 109 Ill. 2d 369.) Nevertheless, under the plain-error doctrine's exception of correcting grave errors, we shall address this argument. See *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 182.

In refusing defendant's tendered involuntary manslaughter instruction, the trial court found that her defense of accident was legally inconsistent with the element of recklessness, which is necessary to sustain a verdict of involuntary manslaughter. The court further held that the evidence failed to disclose any facts to support such a finding. Specifically, the court below stated that because defendant never testified that she stabbed Josh, her version of the evidence was that Josh stabbed herself, and, therefore, the record did not support an involuntary manslaughter instruction.

■ A person commits involuntary manslaughter when she "kills an individual without lawful justification *** if [her] acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and [she] performs them recklessly." (Ill. Rev. Stat. 1987, ch. 38, par. 9—3(a).) Recklessness is defined by section 4—6 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 4—6) thusly:

> "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. An act performed recklessly is performed wantonly, within the meaning of a statute using the latter term, unless the statute clearly requires another meaning."

■ Generally, in a murder trial, it is error to refuse instructions on manslaughter if the record holds *any evidence* which, if believed, would reduce the crime to a lesser offense. (*People v. Jenkins* (1975), 30 Ill. App. 3d 1034, 1037.) Manslaughter instructions should be given even though the theory of the defense at trial is inconsistent with the possibility that defendant is guilty of the lesser offense. *Jenkins*, 30 Ill. App. 3d at 1037.

■ A review of cases concerning involuntary manslaughter instructions establishes that the evidence in this case justified an instruction on said offense. In *People v. Jenkins* (1975), 30 Ill. 3d 1034, defendant went to his estranged wife's home, armed with a knife. When the wife came home, defendant held a knife to her throat ask-

ing her about her relationship with decedent, who was outside the home. The wife managed to flee, followed by defendant, who came upon decedent on the landing. Decedent took hold of defendant and a scuffle began. Defendant broke away and continued to chase his wife. In the struggle, decedent was stabbed in the back and later died of complications arising from the wound. Defendant did not remember stabbing the decedent. Defendant stated that he had put the knife to his wife's throat to force her to get the decedent to leave in order to talk to her alone. The *Jenkins* court found that, if the jury believed defendant, it could have determined that he knew or should have known that handling the knife as he did created the strong possibility of resulting death or great bodily harm. Consequently, the *Jenkins* court ruled that jury should have received an instruction on involuntary manslaughter.

In *People v. McCarroll* (1988), 168 Ill. App. 3d 1020, defendant's primary theory at trial was accident. Defendant testified that he was armed with a gun when he entered a gas station because he had been attacked in the same neighborhood a week prior. He bought a package of cigarettes with a $20 bill. Decedent refused to give him any change, saying that defendant had paid with a $1 bill. Defendant wanted his change and would not leave the store even though decedent was swearing at him and telling him to leave. Decedent pulled a gun, and defendant rushed towards him, causing the gun to fall to the floor. In the ensuing struggle, decedent pulled at the gun in defendant's waistband. Defendant grabbed for his gun, and the men fought over it. In the struggle, the gun discharged twice, striking and killing the decedent.

The *McCarroll* court found that it was reversible error for the trial court to refuse defendant's involuntary manslaughter instruction. It reasoned that the jury could have concluded that defendant behaved recklessly when he entered a gas station armed with a loaded gun and then rushing and struggling with the armed decedent in the confined space, while *still* carrying the gun in his waistband. The *McCarroll* court found that such a finding of recklessness would have supported a verdict of involuntary manslaughter.

In the instant case, Sessie Gibson, defendant's daughter, testified that, immediately prior to the stabbing, defendant and Josh had been arguing and scuffling, *i.e.*, each holding the other by the clothing. Brooks separated them and went upstairs. Defendant then went to the kitchen and returned with a knife in her hands. Sessie ran upstairs to get Brooks and, as a result, did not see how Josh was stabbed.

Brooks testified that prior to the stabbing incident Josh and defendant were struggling with each other so that he had to separate them. Brooks then accompanied Sessie and Josh upstairs. Brooks further testified that Josh went back downstairs, saying that she had one more thing she wanted to say to her mother.

David Kentner of the Freeport police department testified that he interviewed defendant on the evening of Josh's death. Defendant told him that she had been in the kitchen cutting ham and then went to the living room to call Josh, who was upstairs. Josh came down to say something more to defendant. Josh saw the knife next to defendant's right leg, handle forward and blade behind. Josh came forward saying, "Is that for me?" Defendant stated that she raised the knife above her shoulder, and Josh grabbed the hand that held the knife. Defendant pulled back, and Josh pulled forward. Defendant could not recall how Josh was stabbed.

This is sufficient evidence to support an involuntary manslaughter instruction to the jury, which could have determined that defendant behaved recklessly when, after a heated physical and verbal exchange with Josh, she went back to the kitchen and, subsequently, returned with a knife and then became embroiled in another physical struggle with Josh, the result of which was the fatal stabbing of her daughter.

■ The State argues that because defendant's primary defense was accident, she was not entitled to an involuntary manslaughter instruction. While recklessness is not generally seen as synonymous with accident, that distinction is one which is generally made by the trier of fact. (*People v. Consago* (1988), 170 Ill. App. 3d 982, 986.) Here, the initial struggle between Josh, defendant's carrying a knife with a six-inch blade, the alleged struggle between defendant, and Josh's stabbing provide the proper basis upon which to tender a jury instruction on involuntary manslaughter. (See *Consago*, 170 Ill. App. 3d at 986.) It was in the jury's province to determine whether this defendant's actions constituted recklessness. Moreover, the principal case cited by the State, *People v. Abernathy* (1989), 189 Ill. App. 3d 292, is distinguishable on its facts. In *Abernathy*, the victim's severe wounds were torturously inflicted by defendant, who had tied one of the decedent's arms to keep her from resisting. These facts did not support an instruction on involuntary manslaughter.

■ We find that the trial court should have allowed an instruction on involuntary manslaughter; its refusal to give said instruction was reversible error. Accordingly, we conclude that this cause must be remanded for a new trial, in which the court below shall instruct

the jury on involuntary manslaughter.

Despite the necessity of a new trial, we address another issue raised by defendant on appeal because it will likely come up again upon retrial.

Defendant contends that certain rebuttal testimony of Officer Michael Hannan should not have been allowed. Officer Hannan testified that prior to the night that Josh died, he had spoken with defendant on numerous occasions in an official capacity.

"Q. [THE STATE]: Had you known Earlene [defendant] prior to that?

A. Yes, I had.

Q. Approximately how many times had you occasion to talk with the lady?

A. At least twenty times.

Q. Had any of those been under stressful situations?

A. Yes. I would say probably the majority of them were."

Defense counsel objected to the relevancy of this testimony; the court overruled this objection. Subsequently, the prosecutor stated, "I have no objection if counsel wants to go into these other occasions, but I don't think I should go into them." Defense counsel stated he did not want to go into these other circumstances.

The following dialogue then took place.

"Q. [THE STATE]: Officer, based on your observations and conversations with her [defendant] on approximately 20 other occasions, some of which in your opinion were stressful, and based on your observations and conversations of the Defendant on the evening of February the 18th after 7:30 p.m. and before 11:00 p.m. that night, do you have an opinion as to whether or not the Defendant was aware of her surroundings on the 18th?

A. Yes.

Q. Did she seem in any way—strike that. Was she able to respond to your questions?

A. Yes, she was."

Defense counsel objected, arguing that defendant had not made an issue out of her mental state at the time she talked with the police in the hours following Josh's death and, therefore, Officer Hannan's testimony was irrelevant. The trial court overruled this objection.

Defendant contends that Officer Hannan's reference to 20 previous stressful circumstances in which defendant was involved tended to cause the jury to speculate about said circumstances, possibly de-

termining they were criminal in nature. Defendant points out that testimony of Officer Hannan did not explicate the cause of the previous stressful situations. Defendant maintains that Hannan's testimony regarding the prior situations bears no relevance to the severely stressful situation arising out of Josh's death.

The State responds that the purpose of Officer Hannan's testimony was to rebut defendant's claim to the jury that her condition following Josh's death accounted for her several versions of what led to the fatal incident. The State contends that the fact that Hannan had spoken to defendant 20 times in the past was unremarkable. Also, it asserts that this was not evidence of uncharged criminal conduct.

■■ ■ A trial court may refuse offered evidence on the ground of irrelevency if it has little probative value due to its remoteness, uncertainty, or its possibly unfair prejudicial nature. (*People v. Ward* (1984), 101 Ill. 2d 443, 455.) We find that under these circumstances the introduction of evidence pertaining to Officer Hannan's 20 previous interactions with defendant to be prejudicial in nature and, therefore, of little probative value in determining defendant's mental condition following Josh's death. Such a reference invited the jury to speculate as to the nature of those interactions, with the possible result that it was predisposed to find defendant guilty of the offense charged. Moreover, Officer Hannan's testimony as to defendant's mental condition during his questioning of her after Josh's death is sufficient for the State's purpose of rebutting defendant's claim that, in her condition, she did not know what she told the police that night. Thus, on retrial, no reference shall be made to Officer Hannan's 20 previous official interactions with defendant.

We need not address the other issues raised by defendant. We reverse the judgment of the circuit court and remand this cause for a new trial.

Reversed and remanded with directions.

UNVERZAGT, P.J., and GEIGER, J., concur.