THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RICHARD K. RODGERS, Defendant-Appellant.

Second District   No. 2—92—0346

Opinion filed December 27, 1993.

G. Joseph Weller and Paul Alexander Rogers, both of State Appellate Defender's Office, of Elgin, and Jed Stone, of Law Offices of Jed Stone, Ltd., of Chicago, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

Following a jury trial in the circuit court of Du Page County, the defendant, Richard Rodgers, was found guilty of home invasion (Ill. Rev. Stat. 1991, ch. 38, par. 12—11 (now 720 ILCS 5/12—11 (West 1992))) and first-degree murder (Ill. Rev. Stat. 1991, ch. 38, par. 9—1 (now 720 ILCS 5/9—1 (West 1992))). The trial court merged the conviction of home invasion into the conviction of first-degree murder and sentenced the defendant to 45 years in prison. The defendant contends on appeal that the trial court erred by: (1) refusing to give an instruction on involuntary manslaughter (Ill. Rev. Stat. 1991, ch. 38, par. 9—3(a) (now 720 ILCS 5/9—3(a) (West 1992))); (2) excluding testimony from the defendant's sister about threats made by the decedent to the defendant; and (3) sentencing him to 45 years' imprisonment. We affirm.

The facts of this case, as gleaned from the testimony at trial, are as follows. Kelly Bahrs and the defendant were married in November 1989, and they separated in February 1991. In March 1991 she began dating the decedent, Allan Quas. In June 1991, Kelly told the defendant that she was seeing Allan. The defendant became enraged and repeatedly called the Quases' home, threatening to kill Allan and his parents. Allan responded by threatening to kill the defendant.

On the afternoon of August 12, 1991, Kelly was sitting in a loveseat in the living room of her father's apartment. Allan was ly-

ing on a couch in the living room. Nobody else was home. At approximately 5:30 p.m., Kelly heard the kitchen screen door open, and she saw the defendant walk into the living room. Kelly testified that his fists were clenched and he looked "very tense." Kelly stated that he walked over to the couch where Allan was sleeping and punched Allan six to eight times in the side of the head "as hard as he could."

Kelly then grabbed a pair of scissors and threatened to stab the defendant. Allan lifted his head, but the defendant pushed him back down and punched him three to five more times. The defendant's hand was "splashing blood all over." Kelly threatened to call 911 and she ran into the kitchen. The defendant followed her into the kitchen and then ran out the door.

Kelly called 911 and yelled for a next-door neighbor, Donald Peterson, to come over. Kelly ran back into the living room, where she saw Allan lying on the floor. Kelly attempted to clear Allan's mouth of blood while Donald "pushed on his chest" in order to start him breathing. Paramedics arrived and put Allan on life-support.

The defendant testified that he had taken his eight-year-old nephew and his friend horseback riding on August 12. On the way home, he decided to stop by and see Kelly. He parked and left his nephew and his friend in the car. He walked through the open screen door and into the living room. Allan jumped off the couch and took a swing at him. The defendant then punched Allan in the face. Allan grabbed the defendant's hair and hit the defendant in the crotch. The defendant then hit Allan between 7 and 10 times in the face, while Allan unsuccessfully tried to cover his face with his arms. The defendant stopped punching when Allan said "hold on." After he stopped punching, Allan began "weaving" his head and started acting like he was "dizzy." At that point, Kelly threatened to stab the defendant with the scissors, so he left. The defendant stated that he had not meant to kill Allan.

Several paramedics and police officers testified that when they arrived on the scene they found Allan lying on the floor with his face covered in blood. Allan was having trouble breathing, and life-support was administered to him. He was then transported to the Loyola University Hospital.

Doctor Wendy Marshall testified that when Allan arrived at the hospital he had significant swelling of the brain. Doctors placed a drain into the brain in order to measure the pressure and reduce the swelling. Doctor Marshall testified that a normal pressure

would be "five to ten" and that a pressure over 70 is not compatible with survival. Allan had a pressure in excess of 80. When the doctors first put the drain into Allan's brain, the pressure dropped to 20. However, it soon started to go back up, and Allan "changed clinically." Doctor Marshall testified that Allan's brain swelled to the point that it touched the skull and then began to compress the vital areas of the brain that are responsible for blood pressure, pulse, and blood flow to the brain. Allan was pronounced dead on August 13, 1991.

Doctor Barry Lifschultz testified that he performed an autopsy on Allan on August 15, 1991. He determined that the cause of death was a subarachnoid hemorrhage, which is "bleeding over the surface of the brain underneath a very thin membrane which covers the brain called the arachnoid membrane." Doctor Lifschultz stated that the bleeding was due to blunt trauma, which caused tearing of blood vessels.

Following closing arguments, the trial court gave jury instructions on home invasion, first-degree murder, second-degree murder, and self-defense. The jury found the defendant guilty of home invasion and first-degree murder, and the trial court sentenced the defendant to 45 years' imprisonment.

■■ The defendant first argues that the trial court erred by refusing to give jury instructions on involuntary manslaughter. The basic difference between involuntary manslaughter and murder is the mental state accompanying the conduct causing the homicide. (*People v. Foster* (1987), 119 Ill. 2d 69, 87.) A person commits first-degree murder when he "kills an individual without lawful justification *** [and] either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or he knows that such acts create a strong probability of death or great bodily harm to that individual or another." (Ill. Rev. Stat. 1991, ch. 38, pars. 9—1(a)(1), (a)(2) (now 720 5/9—1(a)(1), (a)(2) (West 1992)).) A person commits involuntary manslaughter when he "kills an individual without lawful justification *** if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." (Ill. Rev. Stat. 1991, ch. 38, par. 9—3(a) (now 720 ILCS 5/9—3(a) (West 1992)).) Recklessness is defined by section 4—6 of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 4—6 (now 720 ILCS 5/4—6 (West 1992))) as follows:

152

"A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation."

The State argued at trial that since the defendant was pursuing a theory of self-defense, which presupposes an intention to kill or cause great bodily harm, he could not receive an instruction on involuntary manslaughter, which is evidenced by recklessness. However, we have held that involuntary manslaughter instructions can be given even when the theory of the defense at trial is inconsistent with the possibility that the defendant is guilty of the lesser offense. *People v. Gibson* (1990), 197 Ill. App. 3d 162, 169.

In a murder trial, it is error to refuse an instruction on involuntary manslaughter if there is any evidence in the record which, if believed, would reduce the crime to the lesser offense. (*Gibson*, 197 Ill. App. 3d at 169.) Such an instruction should not be given, though, if the evidence clearly demonstrates that the crime was murder and there is no evidence which would reduce the crime to involuntary manslaughter. *People v. Ward* (1984), 101 Ill. 2d 443, 451.

The defendant contends that since he used his bare fists to kill the decedent, there was evidence in the record which would reduce the crime to involuntary manslaughter. In support of this argument, the defendant cites *People v. Crenshaw* (1921), 298 Ill. 412. In *Crenshaw*, the jury found the defendant guilty of murder for killing the decedent with a blow from his right hand. The supreme court stated that the "striking of a blow with the fist on the side of the face or head is not likely to be attended with dangerous or fatal consequences" (*Crenshaw*, 298 Ill. at 416-17), and it remanded the cause for a new trial. The defendant also cites *People v. Drumheller* (1973), 15 Ill. App. 3d 418. There, the defendant killed a 14-month-old child by punching it in the stomach. We held that a fatal blow from a fist may constitute murder where there is great disparity in size and strength between the defendant and the decedent (*Drumheller*, 15 Ill. App. 3d at 421), and we affirmed the defendant's conviction of murder. In this case, the defendant argues that since he and Allan were approximately the same size and weight, the trial court should have given the instruction on involuntary manslaughter.

However, the disparity in size between the defendant and the victim is not the only factor to be considered when determining whether there is evidence in the record which would reduce the crime to involuntary manslaughter. The court must also consider the brutality and duration of the beating and the severity of the victim's injuries when determining whether there was evidence of recklessness which would support the giving of an involuntary manslaughter instruction. See *Ward*, 101 Ill. 2d 443; *People v. Tye* (1990), 141 Ill. 2d 1, 16.

In this case, Kelly Bahrs testified that the defendant very forcefully punched Allan in the face six to eight times while he was asleep on the couch in the living room. After Kelly threatened the defendant with a pair of scissors, he hit Allan another three to five times. The defendant testified that Allan punched him first, but he admitted to retaliate by administering 7 to 10 unanswered punches on both sides of Allan's face. Donald Peterson testified that after hearing Kelly scream he ran to her house and found Allan lying on the floor with blood streaming down his face and coagulating on the carpet. Officer Terry Olson testified that when he arrived at Kelly's home on August 12, he saw Allan lying on the floor "with blood around him." One of the paramedics testified that when he arrived on the scene he observed Allan with blood on the "whole front of the face" and swelling around the mouth. He was not breathing. Doctor Marshall testified that when Allan was brought to the hospital he was suffering from a severe head injury and had swelling in the brain. Doctor Marshall testified that the injury was caused by a severe impact to the brain that caused a shearing or direct impact to the brain tissue. Doctor Lifschultz testified that he performed the autopsy on Allan, and he found that the upper and lower right lip had been torn, the upper lid of the right eye was discolored, and the right side of the chin had an abrasion. The doctor also testified that the cause of death was a subarachnoid hemorrhage, or bleeding over the surface of the brain, due to blunt force injury.

In this case the brutality of the beating administered by the defendant, coming after the defendant had repeatedly threatened to kill Allan, precludes a finding of recklessness. In contrast to *Crenshaw*, the defendant did not hit Allan with a *single* blow of the fist, but instead pummelled Allan with approximately 10 punches on both sides of the face. Photographs introduced at trial and made part of the record on appeal further corroborate the testimony of the police officers and medical personnel as to the viciousness of the beating. (See *People v. Brown* (1967), 89 Ill. App. 2d 231 (the

trial court properly denied an instruction on involuntary manslaughter after considering the injuries inflicted on the deceased, including crushing blows to the facial bone structure caused by striking or kicking).) We also note that the defendant's testimony at trial that he did not intend to kill Allan is not evidence of recklessness such that the trial court should have given an involuntary manslaughter instruction. (See *Ward*, 101 Ill. 2d at 451 (the defendant's statement that he "didn't mean to" kill the victim did not require the giving of an involuntary manslaughter instruction where the severity of the beating negated any suggestion that his conduct was only reckless).) We hold that the trial court in this case did not err in refusing to give an instruction on involuntary manslaughter.

The defendant contends, though, that this case is similar to *People v. Jenkins* (1975), 30 Ill. App. 3d 1034, in which the appellate court reversed and remanded for a new trial because the trial court failed to give an involuntary manslaughter instruction. However, we find *Jenkins* to be distinguishable from the instant case. In *Jenkins*, the defendant was chasing his wife with a knife when he encountered her friend, George West. The defendant and West struggled, and West was fatally stabbed. (*Jenkins*, 30 Ill. App. 3d at 1036.) The defendant did not remember stabbing West, and there were no other witnesses to what actually occurred. (*Jenkins*, 30 Ill. App. 3d at 1036.) The appellate court held that the trial court's decision not to give an involuntary manslaughter instruction was reversible error since there was evidence in the record from which a jury could have concluded that the defendant did not intend to stab West but was still reckless in handling the knife. (*Jenkins*, 30 Ill. App. 3d at 1040.) In contrast to *Jenkins*, the defendant in this case did not recklessly wield a weapon such as a knife in his struggle with Allan, but instead intentionally beat Allan approximately 10 times on both sides of the face, causing Allan to die from a brain hemorrhage. *Jenkins* does not support the conclusion that the defendant's purposeful act of repeatedly punching Allan in the face requires the giving of an involuntary manslaughter instruction.

We next address the defendant's argument that the trial court erred in not permitting his sister, Mary Rodgers, to testify about conversations she had with Allan in which he threatened to cut the defendant into "little pieces." The defendant argues that Mary's testimony would have been introduced as evidence of the defendant's apprehension of danger when he encountered Allan and was therefore admissible as an *exception* to the rule against hearsay.

■ We first note that the defendant misstates the basis of his argument. Hearsay is defined as an out-of-court statement offered for the truth of the matter asserted. (*Laughlin v. France* (1993), 241 Ill. App. 3d 185, 192.) If Mary's testimony was offered to prove the effect of Allan's statement upon the defendant's future conduct, it was properly admissible as *nonhearsay*. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence §801.5, at 577 (5th ed. 1990).

However, the record before us indicates that Mary was never questioned about any conversations she personally had with Allan. Rather, Mary was asked to testify about the defendant's statement to her regarding *his* conversations with Allan. The trial court properly sustained the State's objection to this question. Any testimony by Mary about the defendant's out-of-court statement to her that Allan had threatened him would have been hearsay. The reason for this is that Mary's testimony about the defendant's statement would not have been offered to show how the defendant was affected by his own statement, but to prove the truth of the matter asserted (that Allen had threatened to kill the defendant).

Finally, the defendant contends that the trial court abused its discretion in sentencing him to 45 years in prison for committing first-degree murder. The defendant argues that the trial court's sentence ignores both his rehabilitative potential and the mitigating factors argued on his behalf, in particular the evidence that he acted under a strong provocation (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.1(a)(3) (now 730 ILCS 5/5—5—3.1(a)(3) (West 1992))) and had no adult criminal record (see Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.1(a)(7) (now 730 ILCS 5/5—5—3.1(a)(7) (West 1992))). However, the State counters that the defendant waived the sentencing issue by not filing a post-sentencing motion at the trial level. We agree. See *People v. Lindsay* (1993), 247 Ill. App. 3d 518, 527.

■ Nor does the record indicate that the trial court committed any plain errors (134 Ill. 2d R. 615(a)) requiring us to reduce the sentence despite the defendant's failure to file the requisite post-sentencing motion. The trial court examined the presentence report and victim impact statements and heard the evidence in mitigation. Where evidence in mitigation is before the court, we presume that the court considered the evidence, absent some indication, other than the sentence imposed, to the contrary. (*People v. Abrego* (1986), 142 Ill. App. 3d 973, 986.) Further, in weighing the defendant's rehabilitative potential, the trial court was not required to give greater weight to that consideration than to the seriousness of

the offense or the other aggravating factors. (*People v. Brajcki* (1986), 150 Ill. App. 3d 506, 515.) The court determined that a 45-year term of imprisonment was necessary to deter others from committing the same crime. (Ill. Rev. Stat. 1991, ch. 38, par. 1005—5—3.2(a)(7) (now 730 ILCS 5/5—5—3.2(a)(7) (West 1992)).) The 45-year term was within the statutory maximum of 60 years' imprisonment for first-degree murder (see Ill. Rev. Stat. 1991, ch. 38, par. 1005—8—1(a)(1) (now 730 ILCS 5/5—8—1(a)(1) (West 1992))) and did not constitute plain error such that we should reduce the punishment imposed by the trial court.

For the foregoing reasons, we affirm the trial court.

Affirmed.

McLAREN and GEIGER, JJ., concur.