2025 IL App (1st) 240193-U

SIXTH DIVISION

May 30, 2025

No. 1-24-0193

**NOTICE**:  This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).
_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21 CR 9625 |
| | ) | |
| MARTINAS STEIGVILA, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE C.A. WALKER delivered the judgment of the court.
Presiding Justice Tailor and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    ***Held:***    We reduce defendant's conviction from first degree murder to involuntary manslaughter, and remand for resentencing, because the State's evidence was insufficient to demonstrate knowledge or intent to cause serious bodily harm, but did show recklessness.

¶ 2    Following a bench trial, defendant Martinas Steigvila was found guilty of first degree murder and sentenced to 23 years' imprisonment. He appeals, alleging the State's evidence was insufficient to establish the *mens rea* necessary to sustain the conviction. For the reasons below, we reduce Steigvila's conviction from first degree murder to involuntary manslaughter, and remand for resentencing.

¶ 3                                    BACKGROUND

¶ 4    Steigvila was arrested on June 25, 2021, and charged via indictment with two counts of first degree murder (Pub. Act 100-863, § 565 (eff. Aug. 14, 2018) (amending 720 ILCS 5/9-1(a)(1), (2))) of the victim Michael Ruby arising from an incident on March 2, 2019. The indictment alleged Steigvila struck Ruby "about the face and head multiple times with closed fists."

¶ 5    The matter progressed to a bench trial, where Michael Schulte, an employee for the United States Marshal Service, testified that he retrieved Steigvila from Poland in June of 2021 and returned him to Chicago to stand trial.

¶ 6    Patrick Garza testified that he lived in an apartment on the 2300 block of West Augusta Boulevard in Chicago in March 2019. Steigvila was his co-worker at that time. On March 1, 2019, Garza and Steigvila went to Fatpour, a bar in the Ukrainian Village neighborhood of Chicago. Garza drank alcohol at Fatpour, but "was definitely in [his] senses" that night. While at Fatpour, Garza interacted with Ruby, who he knew through a mutual friend, and Naaila Barnette, a bartender at Fatpour. After the bar closed, a group including Garza, Steigvila, Ruby, Barnette, and a few others went to Garza's apartment to continue drinking. Garza described the mood as "[n]o issues. Hanging out. Nothing." Steigvila and Ruby had never met before that night.

¶ 7    At some point that night, Garza and Steigvila arm wrestled. Garza, who defeated Steigvila twice in the arm wrestling matches, characterized the arm wrestling as having "no seriousness"

2

and "just messing around." Ruby recorded the matches on his phone. The videos were played in court, but do not appear in the record on appeal. Immediately after the arm wrestling ended, Garza saw Steigvila "swing on" Ruby with a closed fist. Garza tackled Steigvila to the ground as quickly as he could and told him to leave. Steigvila complied, and Garza then called 911. In its briefing, which Steigvila does not dispute, the State claims the cell phone video depicts Steigvila saying, "When I get mad, I start swinging."

¶ 8    Steigvila did not say anything before he struck Ruby, and Garza did not notice any tension between the two before the attack. Ruby could not defend himself from Steigvila's punches because Steigvila "blindsided" him. Steigvila swung "about two to four times." Garza did not see Ruby swing back at Steigvila. Ruby appeared to be unconscious following the incident.

¶ 9    Garza agreed that Ruby was 6 feet 1 inch tall and weighed approximately 200 pounds, while Steigvila was 5 feet 7 inches tall and weighed 185 pounds.

¶ 10   On cross-examination, Garza testified that before the incident, the group was "having an amazing night." Garza testified he was "not really" intoxicated, and instead "was perfectly fine, able to handle myself, completely fine." Garza was seated three feet away during the incident, and Barnette was next to him. Each punch landed on Ruby's head. Approximately 10 seconds elapsed between the first punch and when Garza tackled Steigvila. While Garza held Steigvila following the tackle, he tried to get up but complied when Garza asked him to leave.

¶ 11   Barnette testified that she bartended at Fatpour on March 1, 2019. She stayed at the bar socializing with Garza after her shift ended and went to Garza's apartment later that night. Garza's friends, including Ruby and Steigvila, were there as well. She had not met them before that night. She drank alcohol after she completed work, but "wasn't that much intoxicated." At some point while the group was at Garza's, he and Steigvila arm wrestled. She was seated next to Garza when

3

this occurred. Ruby recorded the arm wrestling matches on his phone, and when they ended, Ruby showed the videos to Garza and Barnette. Steigvila then approached and said, "oh you want to laugh and joke about the video," and punched Ruby. Ruby was facing away when Steigvila threw the first punch. After that punch, Ruby's nose "started bleeding and his eyes were rolling back in his head." Steigvila then punched Ruby in the head again, who "started falling to the ground." Steigvila hit Ruby more than two times before Garza ended the incident by tackling Steigvila.

¶ 12    On cross-examination, Barnette testified she had seen Garza at Fatpour before that night, but did not "know" him. She could not remember how many drinks she had before the incident. Barnette clarified "[t]here were several punches after the first one. It was non-stop." The incident happened "very fast."

¶ 13    Chicago police officer Genghis Harris testified that he responded to Garza's home on March 1, 2019, and spoke to both Garza and Barnette on scene. Harris smelled alcohol on the breath of both, but neither appeared to be intoxicated "to the point where they could not give [him] information." The State published video from Harris' body-worn camera to the court, which does not appear in the record on appeal. On cross-examination, Harris agreed he did not perform breathalyzer or field sobriety tests on Garza or Barnette before questioning them.

¶ 14    Assistant Cook County medical examiner Lauren Woertz testified that she supervised Ruby's autopsy. Ruby's blood tested positive for amphetamine, but within the "therapeutic range." He suffered external injuries, including to the left side of his face, and seven distinct internal injuries. The internal injuries included (1) "diffuse subarachnoid hemorrhage overlying the brain"; (2) hemorrhages to Ruby's brain stem and cervical spinal cord; (3) severe cerebral edema; (4) hemorrhage within a congenital condition in Ruby's brain called a "arteriovenous malformation," or AVM; (5) hemorrhage of musculature on Ruby's neck and upper back; (6) a "laceration of the

atlanto-occipital membrane, *** a "ligament that connects the base of the skull to the first cervical vertebrae"; and (7) "probable dissection of the left vertebral artery." The injuries were consistent with blunt-force trauma. The external injuries include a bruising and scraping near Ruby's left eye and bruising "on the left side of the upper inner lip." In Woertz's opinion, Ruby's cause of death was "craniocervical injuries due to an assault and the manner of death [was] homicide." On questioning from the circuit court, Woertz explained "these types of injuries are seen in like motor vehicle type accidents, so it's going to be a high-force type injury."

¶ 15    The State rested. Steigvila moved for acquittal, which the circuit court denied. Steigvila did not testify or offer evidence.

¶ 16    Following argument, the circuit court found Steigvila guilty on count II for first degree murder and found both Garza and Barnette to be credible witnesses. The court emphasized that Steigvila "snuck up on" Ruby, and this was not a mutual fight. Regarding intent, the court stated, "Did Steigvila go up to the guy and say I want to kill this guy? I don't think so. His intent wasn't to go up and kill the man; however, he wanted to show something to this victim. He wanted to show I'm not taking any more of this nonsense." The court further emphasized that Steigvila struck Ruby again after the first punch caused a nosebleed, and again after the second punch caused his eyes to roll back in his head and to fall. It concluded, "Words alone are not evidence of provocation for involuntary manslaughter. And the punch, at least the two, maybe three or four, were not recklessly done. They were intentionally done."

¶ 17    At a subsequent proceeding, the circuit court denied Steigvila's motion for a new trial, and the matter moved to sentencing, where, following a hearing, the court sentenced him to 23 years' imprisonment. The court denied Steigvila's motion to reconsider sentence, and this appeal followed.

¶ 18                                   JURISDICTION

¶ 19   The circuit court denied Steigvila's motion to reconsider sentence on January 23, 2024, and

he filed the notice of appeal that same day, giving this court jurisdiction pursuant to article VI,

section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6), and Illinois Supreme Court

Rules 603 (eff. Feb. 6, 2013) and 606 (eff. Apr. 15, 2024).

¶ 20                                    ANALYSIS

¶ 21   On appeal, Steigvila claims the State's evidence was insufficient to establish the necessary

*mens rea* to sustain a first degree murder conviction.

¶ 22   A reviewing court considering the sufficiency of the evidence will construe the evidence in

the light most favorable to the State and determine whether any rational factfinder could have

found the State established the defendant's guilt beyond a reasonable doubt. *People v. Conway*,

2023 IL 127670, ¶ 16. It is not the role of the reviewing court to re-try the defendant, and

accordingly, the reviewing court will not substitute its judgment for that of the factfinder on

evidentiary weight or witness credibility. *Id.*

¶ 23   To sustain the charge of first degree murder, the State had to prove, as relevant here, that

Steigvila performed an act which caused Ruby's death and knew that his act "create[d] a strong

probability of death or great bodily harm" to Ruby. Pub. Act 100-863, § 565 (eff. Aug. 14, 2018)

(amending 720 ILCS 5/9-1(a)(1), (2)). A "strong probability" means that Steigvila knew that great

bodily harm was "practically certain to be caused" by his conduct. 720 ILCS 5/4-5 (West 2016).

¶ 24   Garza and Barnette both testified that Steigvila, angered after losing two arm wrestling

matches to Garza and Ruby laughing with Garza and Barnette about videos of the matches,

punched Ruby multiple times in the head. Ruby did not prepare or brace himself because he and

Steigvila were not engaged in mutual combat. The incident occurred in a matter of seconds, with

Garza specifying 10 seconds. Both Garza and Barnette testified that Steigvila threw more than two punches. Barnette testified that after the first strike, Ruby's nose started bleeding; and after the second, his eyes rolled in the back of his head, and he started falling. In finding Steigvila guilty of first degree murder, the court cited that there was no mutual fight, relied on Barnette's testimony about the visual indications of injury Ruby displayed, and noted Steigvila was angry with Ruby in the moments leading to the attack.

¶ 25    The central issue in this case is where Steigvila's conduct falls with regard to previous cases analyzing a defendant's intent when death results from a bare fist. In *People v. Crenshaw*, 298 Ill. 412 (1921), our supreme court established the general proposition that the "striking of a blow with the fist on the side of the face or head is not likely to be attended with dangerous or fatal consequences, and no inference of an intent to kill is warranted from the circumstances disclosed by the proof in the case." *Id.* at 416. "Since that time, courts in this state have repeatedly confirmed the general rule that death is not ordinarily contemplated as a natural consequence of blows from a bare fist." *People v. Miller*, 2024 IL App (1st) 240588, ¶ 40. The case law typically discusses whether "death" is contemplated from bare-fisted blows, but the principle is generally applied in the wider first degree murder context, including whether a defendant acted with knowledge that great bodily harm would result. See *People v. Axtell*, 2017 IL App 2d 150518, ¶¶ 72-87; *People v. Yeoman*, 2016 IL App 3d 140324, ¶¶ 19-23.

¶ 26    While not directly analyzing the *Crenshaw* bare fist body of law, our supreme court offered helpful guidance in how courts may determine intent in such cases by enumerating certain factors that can differentiate between the *mens rea* needed for first degree murder and involuntary manslaughter: "(1) the disparity in size and strength between the defendant and victim; (2) the brutality and duration of the beating, and the severity of the victim's injuries; (3) whether a

7

defendant used his bare fists or a weapon." *See People v. DiVincenzo*, 183 Ill. 2d 239, 251 (1998). Instances where the State has successfully counteracted the *Crenshaw* rule generally align with the *DiVincenzo* factors. Most prominently, cases where a person of larger size or greater strength strikes a much smaller or weaker individual with a bare fist, resulting in death, has been found to support a first degree murder conviction, an upsetting but necessary body of law typically involving violence against children or the elderly. See *People v. Ward*, 101 Ill. 2d 443, 451-52 (1984); *People v. Brackett*, 117 Ill. 2d 170, 180-81 (1987). Similarly, evidence has been found sufficient to demonstrate the intent for first degree murder where a beating is particularly severe (*People v. Perry*, 2011 IL App (1st) 081228, ¶¶ 33-35), or involves multiple incidents stretched over a period of time (*Axtell*, 2017 IL App 2d 150518, ¶¶ 5-17).

¶ 27 *Axtell* is instructive here. There, the court applied the bare-fist body of law in the "knowledge of great bodily harm" context and affirmed the defendant's first degree murder conviction. The attack involved a domestic violence incident where, during an evening involving multiple attacks on the victim, the defendant at one point knocked the victim unconscious, then, after the victim had regained consciousness, "knocked her unconscious" again. *Id.* ¶ 55. Axtell contended the evidence only established he struck the victim with a single blow from a bare fist and thus could not be guilty of first degree murder. *Id.* ¶¶ 57-58, 72. In affirming the conviction, the court stated that the case differed from previous bare-fist cases because:

> "In each of the cited cases, the defendant inflicted the fatal blow during his initial and sole confrontation with his victim *** [and] there was nothing to put the defendant on notice that he had the ability to cause great bodily harm to the victim with one blow. Here, however, having already knocked [the victim] unconscious and bruised her, defendant punched her again." *Id.* ¶ 74.

¶ 28    Three additional cases with similar fact patterns merit note before our resolution. In *People v. Nibbe*, 2016 IL App (4th) 140363, the court found the evidence did not establish the *mens rea* to sustain a second degree murder conviction where the attack only involved a single punch, which caused the victim to fall and sustain a skull fracture, the ultimate cause of death. *Nibbe*, ¶¶ 4, 19. The court reasoned, "the State has not cited any cases where one blow from a bare hand by a single assailant was sufficient to sustain a first degree murder conviction," and continued "the evidence did not show a strong probability [the victim] would fall and strike his head on the concrete with the force that it did." *Id.* ¶ 34. Similarly, in *Yeoman*, 2016 IL App 3d 140324, the court found the evidence that the defendant punched the victim once in the head during a road rage incident did not suffice to sustain a second degree murder charge. *Yeoman*, 2016 IL App (3d) 140324, ¶¶ 3-11, 22. It emphasized that a single bare fist strike "is not the type of conduct that would generally create a strong probability of death or great bodily harm," and thus the defendant "could not have knowledge that such a result was practically certain to occur." *Id.* ¶ 22.

¶ 29    Finally, in *People v. Lengyel*, 2015 IL App (1st) 131022, another panel of this court reduced a second degree murder conviction to involuntary manslaughter where the defendant, Steven Lengyel, struck his father Richard four to five times in the head during an argument. *Lengyel*, 2015 IL App (1st) 131022, ¶ 10. Richard was bleeding but coherent immediately afterwards, and asked Steven to call an ambulance, which he did. Richard died two days later in the hospital following a stroke. *Id.* ¶ 6. This court found that the record did not support a finding that Steven had the intent for first degree murder, citing that Steven and Richard were similar in size, and the incident lasted a "matter of minutes." *Id.* ¶¶ 53-55. The court also noted that Richard died of a stroke, and this indicated that while Steven did not have the requisite intent to kill or cause great bodily harm from

the punches alone, he punched Richard while knowing he had high blood pressure, which constituted recklessness. *Id.* ¶ 64.

¶ 30 As guided by the above body of law, we find no rational factfinder could conclude that the State proved the intent element of first degree murder beyond a reasonable doubt, and thus Steigvila's conviction for that specific charge must be reversed. The unique circumstances here do not show that Steigvila knew that his conduct was almost certain to cause death or great bodily harm to Ruby such that the bare-fist principle should not apply. The attack consisted of a single incident in which he punched Ruby four times (construing the evidence in the light most favorable to the State) in a matter of seconds—Garza stated 10 seconds, while Barnette could only relay that it happened very quickly. There was no indication from earlier in the night that Steigvila had animosity towards Ruby beyond the arm wrestling videos. This conduct falls well outside that which Illinois courts have found may elevate the use of fists to first degree murder. The most common—size differential—is not at issue, as these were two adult men and Steigvila was the smaller of the two, far from the circumstances in which Illinois courts grant bare fist exceptions such as when an adult harms a child or an elderly person. *Ward*, 101 Ill. 2d at 451-52; *Brackett*, 117 Ill. 2d at 180. And this case also falls outside those where a sustained attack involving multiple blows was cited as reason for finding sufficient intent for first degree murder, which involve multiple assailants, multiple incidents of violence over a period of minutes, or kicks and punches to a victim after the attacker realizes the victim is motionless on the ground. See *Perry*, 2011 IL App (1st) 081228, ¶¶ 33-35; see also *People v. Castillo*, 2012 IL App (1st) 110668, ¶¶ 56-57, 63.

¶ 31 In so concluding, we find the distinction between Steigvila's conduct and the defendant's conduct in *Axtell* particularly instructive. The *Axtell* court concluded the defendant had the requisite knowledge that a punch in a subsequent incident could cause great bodily harm because,

in an earlier incident, the defendant caused the victim to lose consciousness with a punch. *Axtell*, 2017 IL App 2d 150518, ¶ 74. It followed that because the defendant knew his punch could cause that specific harm, he acted with knowledge that great bodily harm was almost certain to result when he subsequently punched the victim again. *Id.* at ¶¶ 74-75. Conversely, there is nothing in the record here to indicate Steigvila threw the punches with any level of certainty that great bodily harm would be the result. Without such specialized knowledge or other aggravating circumstances, we must apply the default law in Illinois and conclude Steigvila did not act with the requisite intent to commit first degree murder.

¶ 32   This does not end our analysis, however, because where appropriate a reviewing court may reduce the degree of a conviction. Ill. S. Ct. R. 615(b)(3) (eff. Mar. 15, 2025). As other courts considering this line of cases have done, we find Steigvila's conviction should be reduced from first degree murder to involuntary manslaughter, and remand for resentencing. See *Lengyel*, 2015 IL App (1st) 131022, ¶ 64. We note Steigvila does not make this specific request in his briefing, but we may take such action *sua sponte*. See *People v. Guerrero*, 2018 IL App 2d 160920, ¶ 63.

¶ 33   The evidence showed Steigvila displayed a conscious disregard of the risk of great bodily harm, thus establishing the *mens rea* for involuntary manslaughter. See 720 ILCS 5/9-3(a) (West 2016); 720 ILCS 5/4-6 (West 2016). While the incident lasted only seconds, Barnette's testimony construed in the light most favorable to the State would allow a rational factfinder to conclude that Steigvila punched Ruby twice after he displayed visual signs of harm, allowing for the inference that Steigvila recognized that great bodily harm was possible during the seconds-long attack, but then consciously disregarded the risk. See *DiVincenzo*, 183 Ill. 2d at 250 ("[A] defendant acts recklessly when he is aware that his conduct might result in death or great bodily harm, although that result is not substantially certain to occur"). The State suggests these facts demonstrate

11

knowledge of great bodily harm, but this ignores the speed with which the incident occurred and the fact that Steigvila had no knowledge that Ruby was particularly susceptible. *Axtell*, 2017 IL App 2d 150518, ¶ 74. Given the other circumstances and the Illinois case law in this area, this case is much more aligned with a case like *Lengyel*, where the defendant was aware that striking his father with a bare fist carried a risk of significant harm given his father's background health problems, but he did so anyways. *Lengyel*, 2015 IL App (1st) 131022, ¶ 64.

¶ 34    The State argues that Steigvila's intent level can be intuited from the force of the blows, which caused the aforementioned internal injuries the medical examiner likened to those caused by a car crash. There is no dispute that the injuries Ruby suffered were significant, and injury severity is a factor for analyzing intent. See *DiVincenzo*, 183 Ill. 2d at 251. But we are not convinced this factor has any relevance to Steigvila's intent in the present case for two reasons: (1) there was no evidence showing Steigvila had any reason to anticipate his punches would have such severe effects, and (2) the incident occurred rapidly, and there is no evidence Steigvila ever knew that he was causing great bodily harm and persisted anyways. See, e.g. *People v. Castillo*, 2018 IL App (1st) 153147, ¶ 35 (knowledge shown where beating lasted one to two minutes and consisted of "two individuals simultaneously delivering repeated blows to another who lay facedown on the sidewalk not fighting back or moving."). We are not swayed from this position by the State's repeated citations to irrelevant size disparity cases, especially those where the victim of the defendant's bare-fisted strikes was a young child. See *People v. Rodriguez*, 275 Ill. App. 3d 274, 285 (1995) (victim was three years old); *People v. Morgan*, 62 Ill. App. 3d 279, 280, 284 (1978) (victim was five months old).

¶ 35    Similarly, as discussed above, we reject the State's argument that Steigvila's intent can also be determined from the severity of Ruby's external injuries. The rapid nature of the incident sets

12

it apart from situations like *Axtell* where the record demonstrated the defendant learned during the course of an incident that he had already caused great bodily harm to a victim and subsequently struck the victim again anyways. *Axtell*, 2017 IL App 2d 150518, ¶ 74.

¶ 36    Finally, the State argues that Steigvila's anger illustrates his intent, citing *People v. Summers*, 202 Ill. App. 3d 1, 11 (1990), for the proposition that acting out of anger shows a defendant did not act recklessly. First, we reject the citation to *Summers* as instructive, as there the victim was a 19-month-old child, and once again, this is not a size/strength disparity case. *Id.* Citation aside, the argument fails because the issue is the severity of harm Steigvila *knew* would result. While there is no doubt Steigvila intended to cause *some* harm to Ruby, the question is whether that intent to harm rose to an intent to cause *great* bodily harm, or the knowledge that it was practically certain to result. The record does not support that conclusion where it is undisputed that Steigvila and Ruby were essentially strangers and Steigvila punched Ruby in a sudden fit of anger. See *Yeoman*, 2016 IL App (3d) 140324, ¶¶ 3-11, 22 (attack arose from road rage incident against a stranger).

¶ 37    The State's cited case of *Rodgers* is helpful on this point. *People v. Rodgers*, 254 Ill. App. 3d 148, 149, 153-54 (1993). There, the defendant's intent level was found sufficient for first degree murder in circumstances where (1) the defendant had previously threatened to kill the victim, and then (2) while the victim was sleeping, the defendant punched the victim in the head approximately 10 times. *Id.* at 153-54. The *Rodgers* court found the bare-fist presumption did not apply to the defendant because the circumstances demonstrated the greater *mens rea*, specifically the repeated blows against a sleeping (and thus defenseless) victim whom the defendant had previously expressed the intent to kill. *Id.* Steigvila, conversely, had no previous issues with Ruby which illustrated that his intent or knowledge in throwing punches elevated to the required level. See *Id.*

13

at 149, 153-54; see also *Perry*, 2011 IL App (1st) 081228, ¶¶ 33-35; *People v. Doolan*, 2016 IL App (1st) 141780, ¶¶ 52-53 (fact that attack was gang-related illustrated intent behind the throwing of a bare fist).

¶ 38                                              CONCLUSION

¶ 39   The State did not provide evidence to counteract the general understanding in Illinois that Steigvila's conduct in striking Ruby with his bare fists did not demonstrate the *mens rea* necessary to sustain a first degree murder conviction, but did establish he consciously disregarded the risk of such harm. In similar circumstances, other panels of this court have saw fit to exercise their discretion to reduce the defendant's conviction to involuntary manslaughter per Rule 615. We find this resolution is also appropriate here, and accordingly we reduce Steigvila's conviction from first degree murder to involuntary manslaughter (720 ILCS 5/9-3(a) (West 2016)), and remand for resentencing.

¶ 40   Reversed and remanded for resentencing.